UNITED STATES

v.

**Lawrence KEARNEY, Appellant.**

**No. 81–1043.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 18, 1981.

Decided June 18, 1982.

Richard A. Friedman, Washington, D. C. (appointed by this court), for appellant.

Lisa J. Stark, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before TAMM, MacKINNON and ROBB, Circuit Judges.

MacKINNON, Circuit Judge.

Lawrence Kearney appeals the denial by the District Court of a 28 U.S.C. § 2255 motion to set aside his 1968 conviction for second degree murder. He now contends, as he did on his first § 2255 motion in 1973, that a key witness' testimony was coerced and perjurious. The judge who had tried the case denied that motion on "the files and record." This, the second § 2255 motion raising the same point, was denied by the District Court without a hearing. No new evidence or contention is offered in support of appellant's motion. Since the facts underlying appellant's claim were decided adversely to appellant in the direct appeal and the 1973 motion, and since both motions were in addition untimely filed, appellant's allegations do not entitle him to relief. We accordingly affirm the judgment of the District Court.

## I. FACTS AND PRIOR PROCEEDINGS

At approximately 10:30 p. m. on Thanksgiving Day, November 23, 1967, Officer Silvia of the District of Columbia Metropolitan Police Department was fatally shot while on duty in the vicinity of 16th and Corcoran Streets, N.W. Immediately prior to the shooting, Officer Silvia, while seated in his cruiser at a stop light, noticed a man tampering with the window of a locked car

parked across the street. He eventually drove up to the car and identified himself as an officer to the man he had previously noticed and who was now the sole occupant of the car, having gained entry thereto by breaking a hole in the door window. The man was seated behind the wheel, but when the officer approached him, he exited the car, and in response to Silvia's request for his identification, the man reached into his pants pocket, pulled out a gun and shot Silvia in the stomach with a .38 caliber revolver. Shortly thereafter Silvia was taken to the hospital. Despite emergency surgery Officer Silvia died two days later from the gunshot wound.

At trial, the only disputed issue was the identity of the murderer. The government introduced strong testimony which established that appellant was the assailant and the jury returned a verdict of guilty. At trial, Detective Crooke testified as to the dying declarations of Officer Silvia made during an interview in the intensive care unit of the hospital before he died, in which Silvia described all the facts that led up to the shooting. He told Crooke that he had observed the killer break into the car parked at the curb. Part III fully discusses Silvia's statement. In addition, Kearney's palm prints were found inside the car on the steering wheel, and blood stains of appellant's blood type were found in the glove compartment. Further evidence indicated that the car did not belong to Kearney and that he had never previously had access to the interior of the car.

There was also highly corroborative circumstantial evidence of Kearney's guilt. A friend of Kearney's testified that, on the day of the murder, appellant had fired a .38 caliber revolver into a log in his backyard. A firearms identification expert testified that the bullet removed from the log, another .38 caliber slug found in the front door of appellant's house, and the .38 caliber slug removed from Officer Silvia's abdomen were all fired from the same type gun. In addition, an unfired .38 caliber bullet of the same unique type that killed Silvia was recovered from the dresser drawer in Kearney's bedroom. The unfired bullet and the three slugs were all manufactured by the same company and had the same distinctive copper coating. In addition to the scientific evidence, Stanley Warren, an eyewitness to the shooting, and a friend of Kearney's, *voluntarily* approached Officer Crooke on the street three days after the shooting and offered to tell him what he knew about the shooting. At that time Warren gave a statement and at trial gave testimony that was consistent with his statement, viz., that he was standing within a few feet of where Silvia was shot and he had seen Kearney shoot Silvia.

On August 2, 1968, Kearney was convicted by a jury of second degree murder (22 D.C.Code § 2403) and of carrying a dangerous weapon (22 D.C.Code § 3204). On September 13, 1968, he was sentenced to imprisonment of fifteen years to life on the murder count and to a concurrent sentence of three to ten years on the weapons count.

Kearney appealed his conviction to this court, arguing primarily that the "prejudicial" identification testimony of witness Warren was not credible. This Court in an opinion by Judge Leventhal found Kearney's arguments unpersuasive and affirmed his conviction. *United States v. Kearney*, 420 F.2d 170 (D.C.Cir.1969). Specifically, we held that the failure of the trial court to allow defendant's counsel to cross-examine witness Warren as to whether or not he was on narcotics at the time he gave a statement to the police was not grounds for a reversal or remand since the possibility of mistaken identity of the defendant was strongly negatived—"if indeed it is not eliminated beyond reasonable doubt—" by other evidence. The conclusive nature of the evidence Judge Leventhal referred to has not changed with the passage of time.

On September 12, 1973, over five years after he was sentenced and four years after the affirmance on appeal, Kearney filed a habeas corpus proceeding claiming (1) newly discovered evidence, (Petition, ¶ 3), (2) "ineffectiveness of counsel," (3) denial of fair trial under the 5th, 6th and 14th Amendments and the Bill of Rights, (4) use

of pre-fabricated and manufactured testimony of an alcoholic drug-addict, and (5) that relevant issues he raised had not been challenged. The alleged "newly discovered evidence" was set forth in an affidavit by witness Warren.[1] Warren was 17 at the time of the trial and his affidavit five years later stated that at trial he had testified falsely that he was present and saw his friend Kearney shoot Silvia. *Id. This affidavit was not given* in support of Kearney's *pro se* petition *until both Warren and Kearney were confined at the Department of Corrections for the District of Columbia, at Lorton, Virginia.* Petition ¶ 1. Warren was confined in the Lorton Youth Center. See signature, n.1. The court denied the habeas corpus petition on the ground that a proceeding under 28 U.S.C. § 2255 was required and the government moved that the "petition be treated in the alternative as a motion to vacate under Section 2255."

Thereafter on November 15, 1973, Kearney filed a section 2255 motion (1) alleging ineffective assistance of counsel, and (2) that his conviction was based on "prefabricated and manufactured evidence" and the "perjured testimony of Stanley Warren." District Court File, 39, p. 2. The principal support for the petition was the Warren affidavit. *Id.* This petition was considered by the judge who had tried the criminal case and on February 12, 1974, was denied "upon consideration of the *files and record*

of this case and the opinion of the United States Court of Appeals for the District of Columbia Circuit in *United States v. Kearney,* 136 U.S.App.D.C. 328, 420 F.2d 170 (1969) (rehearing denied)." (emphasis added). The denial was accompanied by a written order, *infra,* which considered the various elements upon which Kearney based his petition, and recognized that the claim of possible narcotics use was the alleged underpinning for the assertion of perjury which in substance amounted to an attack on the *identification testimony:*

The subject [limited exploration of possible narcotic influence of Stanley Warren at the time of his written statement] relates to the issue of identity, and the possibility of mistaken identity is strongly negatived—if indeed it is not eliminated beyond reasonable doubt—by the scientific evidence, particularly the palm prints, and the credibility of Warren's testimony as buttressed by the account given by Officer Silvia to Detective Crooke. Such strength of the Government's case is highly material in determining whether the interest of justice may be served by affirmance rather than remanded for refinement of trial procedure. *United States v. Kearney, supra,* 420 F.2d at 174.

District Court File, 40.

█ It is clear that the trial court complied with the applicable rule, considered

1.                     AFFIDAVIT
    I, Stanley Warren, hereby state the following under my free will and according to my desire. I have not been threatened in any way or have I been promised anything for this statement. I make this statement because I want to do so.
    I, Stanley Warren, declare that the statement which I gave to the police on Sunday, November 26, 1967 concerning the death of Officer Gilbert Silvia is partially untrue. I was not present at the scene of the shooting and I did not see Larry Kearney shoot Officer Silvia. The original story which I told the police and which is contained in the first part of my statement is true. I changed my story during the police questioning because of the extreme mental, emotional and physical pressure which was exerted on me for a number of hours on Sunday evening by numerous officers. Earlier, Sunday afternoon, I had taken a shot of heroin and at the time I was

so intensely questioned by the police that evening, I was withdrawing from the drug and feeling very ill.
    I, Stanley Warren, further state that the testimony which I gave under oath at the trial concerning the witnessing of the shooting of Officer Silvia is also untrue. I testified I saw Larry Kearney shoot Officer Silvia because I was afraid to change the untrue story which I had finally given the police officers that Sunday evening.
                    Submitted by,
                    /s/  Stanley N. Warren
                    Stanley Warren
                    Box VC, Lorton Youth Center
                    Lorton, Virginia
Subscribed and sworn to before me this 4th day of June, 1973.
                    /s/  Charles S. Thompson
                    Notary Public
                    My Commission Expires 9–10–73

the files and record relating to the judgment of conviction, and properly ruled on the basis of the motion, the annexed exhibits and the prior proceedings that Kearney was not entitled to any relief. The court was therefore authorized by the applicable rule to "make an order for ... summary dismissal [of the motion]." No hearing was required.

> The [§ 2255] motion, together with all the files, records, transcripts, and correspondence relating to the judgment under attack, shall be examined promptly by the judge to whom it is assigned. If it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the movant to be notified...."

*Rules Governing Section 2255 proceedings in the United States District Courts*, 4(b). Since the court considered and ruled on the substantive grounds upon which Kearney based his claim of legal rights as set forth in the affidavit of Warren and upon the "files and record" in the case, and not on any defect of form or procedure; and since under section 2255 the court had complete jurisdiction over the subject matter and parties to decide the validity of Kearney's motion, its order denying such motion constituted a decree on the "merits". *Mayes v. Pickett*, 537 F.2d 1080, 1082–83 (9th Cir. 1976), *cert. denied*, 431 U.S. 924, 97 S.Ct. 2198, 53 L.Ed.2d 238 (1977); *Fairmont Aluminum Co. v. Commissioner of Int. Rev.*, 222 F.2d 622, 625 (4th Cir. 1955); *Walling v. Miller*, 138 F.2d 629, 631–32 (8th Cir. 629); *Clegg v. United States*, 112 F.2d 886, 887–88 (10th Cir. 1940).

No appeal was taken from this § 2255 ruling.

Over seven years later, on October 14, 1980, after the trial judge had died, Kearney filed a second petition under section 2255. This was his third request to this

court to vacate his conviction. As presented to the trial court, it raised essentially the same claim with respect to Warren's testimony that was made and decided adversely to him in 1973, i.e., that Kearney's Fifth Amendment due process right was abridged in that "Stanley W. Warren's confession [sic] was [allegedly] coerced and obtained under duress and that it was erroneous and perjured testimony ..." Kearney also raised constitutional issues relating to procedure.

The District Court denied this repetitive 1980 motion by fiat, District Court File, No. 43, and the instant appeal followed.[2] On receiving this case, present appellate counsel conceded that the District Court had properly ruled on the procedural issues, but chose to pursue, for the second time in a § 2255 proceeding, the claim that Warren's testimony was perjured.

## II.  TIMELINESS AND THE FILING OF THE MOTION

■ We find that Kearney's 1980 motion under section 2255 was properly rejected by the District Court. To begin with, it is basically a motion for a new trial based on newly discovered evidence filed pursuant to Fed.R.Crim.P. 33, *Pelegrina v. United States*, 601 F.2d 18, 19 (1st Cir. 1979), and it was not filed in the timely fashion as required by that rule which provides:

> The court on motion of a defendant may grant a new trial ... if required in the interest of justice.... A motion for new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment ....

The present motion brought 12 years after Kearney's conviction, to the extent that it seeks a new trial based on newly discovered evidence, clearly exceeds the two-year time limit prescribed by the rule. So did the first motion in 1973 which was filed over five years after sentence was adjudged. While the trial court did not rely on the two

---

**2.** Appellate counsel was appointed by a panel of this court over a dissent that analyzed the facts and prior proceedings and decisions.

*United States v. Kearney*, 659 F.2d 1203 (D.C. Cir.1981).

year limitation when it denied Kearney's motion on February 12, 1974, five years after his sentence became final, and it is not necessary to rely on it now, the staleness of the claim, now over 13 years old, should not be ignored. *Cf. Oddo v. United States,* 171 F.2d 854, 858 (2d Cir.), *cert. denied,* 337 U.S. 943, 69 S.Ct. 1498, 93 L.Ed. 1747 (1949); *see generally United States v. Robinson,* 361 U.S. 220, 80 S.Ct. 282, 4 L.Ed.2d 259 (1960). The recognized difficulties imposed on the government in reprosecuting criminal cases long after the event present considerations that are to be weighed in the balance against granting new trials. A collateral attack must also clear a "sufficiently higher hurdle than a ... direct appeal." *United States v. Frady,* —— U.S. ——, 102 S.Ct. 1584, 1594, 71 L.Ed.2d 816 (1982). Our decision is not based on the untimeliness of the motion, but we consider that that fact and the difficulties it creates justify comment.

### III. SECTION 2255 PROCEEDINGS AND RECANTING AFFIDAVITS

■ Attempts are numerous by convicted defendants to overturn their criminal convictions by presenting affidavits of recanting witnesses in support of a section 2255 motion. As stated above, courts treat such requests as a motion for new trial. *Pelegrina v. United States, supra.* Recanting affidavits and witnesses are looked upon with "the utmost suspicion" by the courts. *United States v. Vincent,* 491 F.2d 1326, 1332 (2d Cir.), *cert. denied,* 419 U.S. 880, 95 S.Ct. 144, 42 L.Ed.2d 120 (1974); *United States v. Johnson,* 487 F.2d 1278 (4th Cir. 1973); *United States v. Lewis,* 338 F.2d 137 (6th Cir. 1964); *Newman v. United States,* 238 F.2d 861, 862 n.4 (5th Cir. 1956); *United States v. Ahern,* 612 F.2d 507, 509 (10th Cir. 1980) ("downright suspicion"); *United States v. Ward,* 544 F.2d 975 (8th Cir. 1976); *United States v. Mackin,* 561 F.2d 958, 961 (D.C.Cir.1977) ("recantations by witnesses for the prosecution are viewed with suspicion ..."); *Johnson v. United States,* 291 F.2d 150, 154 (8th Cir.), *cert. denied,* 368 U.S. 880, 82 S.Ct. 130, 7 L.Ed.2d 80 (1961) (courts look upon recantation with suspicion).

■ A motion for new trial may be decided on the basis of affidavits without an evidentiary hearing. *Ewing v. United States,* 135 F.2d 633, 638 (D.C.Cir.1942) (Rutledge, J.); *Hillman v. United States,* 192 F. 264, 272 (9th Cir. 1911), *cert. denied,* 225 U.S. 699, 32 S.Ct. 834, 56 L.Ed. 1263 (1912); *Chetkovitch v. United States,* 53 F.2d 26 (9th Cir. 1931); *Gordon v. United States,* 178 F.2d 896 (6th Cir.), *cert. denied,* 339 U.S. 935, 70 S.Ct. 664, 94 L.Ed. 1353; *United States v. Johnson,* 327 U.S. 106, 112, 66 S.Ct. 464, 466, 90 L.Ed. 562 (1946). *United States v. Ward, supra,* in the 8th Circuit, is to the same effect. In affirming the denial, without a hearing, of a new trial based on a recanting affidavit of a witness its *per curiam* opinion states:

Appellants contend that the trial court erred in denying their new trial motion without the benefit of a hearing to determine the validity of the alleged recanted testimony. A motion for new trial based on newly discovered evidence may be decided ordinarily upon affidavits without a hearing. [citations omitted] .... Moreover, *the necessity for a hearing is diminished in cases involving challenged testimony where the trial judge has had an opportunity to observe the demeanor and weigh the credibility of the witness at trial.* [citation omitted] ... Furthermore, 'courts look upon recantation with suspicion. The trial court, which has had the witness before it, is in a much better position to determine where the truth lies than an appellate court.' [citation omitted]. On this record we are satisfied the court did not abuse its discretion in failing to hold a hearing." 544 F.2d at 976. (emphasis added).

A similar factual situation was presented by the moving defendants in *United States v. Curry,* 497 F.2d 99 (5th Cir. 1974). Movants had been convicted of counterfeiting on the basis of a co-defendant's testimony; then the co-defendant signed a recanting affidavit stating that some of the testimony was perjured. Defendant's motion for a new trial on the basis of the affidavit was

denied without a hearing. On appeal the Fifth Circuit stated "[t]he law of this circuit has previously been well established that a motion for new trial may ordinarily be decided upon affidavits without an evidentiary hearing [citations omitted] ... the acumen gained by the trial judge who presided during the entire course of the proceedings makes him well qualified to rule on the motion for a new trial on the basis of the affidavit and makes a time consuming hearing unnecessary." *Id.* at 100, 101. The same conclusion was reached in *United States v. Hedman*, 655 F.2d 813 (7th Cir. 1981) ("... in Section 2255 cases ... the existing record and the court's recollection obviate the need for a hearing where, as here, the judge entertaining a request for a new trial also presided at the original trial").

▉ Another factor weighing against Kearney's untimely motions is that delays varying from 5 to 12 years, as Judge Burger (now Chief Justice) observed, "properly puts the movant under a heavier burden for the passage of time inevitably ripens the finality of the judgment and increases the difficulties of again proving the case." *Brodie v. United States*, 295 F.2d 157, 159–60 (D.C.Cir.1961).

▉ Kearney's present motion, based on Warren's recanting affidavit, embodies many of the factual features that have led courts to deny similar attempts by convicted defendants to obtain new trials or vacation of convictions. First, Warren's testimony was subjected to thorough cross examination at trial and was corroborated in *every* detail by the physical evidence and testimony of other witnesses credited by the jury and the court. Second, while Warren was apparently not involved in Kearney's breaking into the automobile, he was a friend of Kearney's at the time of the murder and both were imprisoned at Lorton in 1973 when Warren gave the affidavit to Kearney acting *pro se*. The compulsion that prison confinement exerts on a fellow inmate, who as a witness had testified against a fellow prisoner in such circumstances, is too well known to require elaboration. *See United States v. Johnson*, 487 F.2d 1278 (4th Cir. 1973) (denying motion where the affidavit was executed two and one-half years after the trial when the affiant and the prisoner were inmates together in prison). Third, the same judge who had tried the case, and observed Warren's demeanor and testimony on the stand at the criminal trial, also ruled on the 1973 motion. Fourth, Warren's affidavit is conclusory in form. It merely states generally that his statement to the police and his testimony at trial were "partially untrue" without offering any explanation as to how he had learned of all the intricate details surrounding the crime unless he had personally observed them as he testified at trial.

As in *United States v. Mackin*, 561 F.2d at 963, it defies credence that Silvia in his dying declaration, and Warren in his statement to the police and subsequent testimony, contrived identical falsehoods concerning the minute details and precise circumstances of the crime, and of all the events leading up to it. The principal portion of Warren's statement to the police is set forth as an appendix hereto. It was marked for identification as Defendant's Exhibit No. 1, but was not introduced into evidence. However, it was read from and referred to extensively in the cross-examination of Warren by defense counsel. It was also shown to him. (App. 83–124).

▉ In considering a motion for new trial based on the contention that an affidavit by a recanting witness constitutes newly discovered evidence the first test to be applied by the judge is whether the court is reasonably well satisfied that the prior testimony was false. *Gordon v. United States*, 178 F.2d 896, 900 (6th Cir. 1949). If that first and primary ground is not satisfied, the primary ground for granting the new trial is lacking. *Id.* The trial judge who denied the 1973 motion obviously determined that Warren's affidavit, recanting his testimony at trial, was false. In so ruling he was in the same position as the judge in *United States v. Johnson*, 327 U.S. at 113, 66 S.Ct. at 467, where the Supreme Court observed with respect to the trial judge:

He had conducted the original trial and had watched the case against Johnson and the other respondents unfold from day to day. Consequently the trial judge was exceptionally well qualified to pass on the affidavits.

■ The decision here on the 1973 motion was made "upon consideration of the files and records of this case and the opinion of the ... Court of Appeals ..." The court ruled: "(2) That the claims of error *respecting manufactured testimony*, the prosecutor's knowing use of perjured testimony, and ineffective assistance of counsel taken in light of the pleadings and record are mere conclusions without supporting facts. (3) That the motions, pleadings, files and records *conclusively show* that petitioner is entitled to no relief ..." A factual determination that the *files and record* conclusively resolved the issue is an adjudication "on the merits" even though no evidentiary hearing was held. *Sanders v. United States*, 373 U.S. 1, 16, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148 (1963), *Mayes v. Pickett*, 537 F.2d 1080, 1083 (9th Cir. 1976), *Hallowell v. United States*, 197 F.2d 926, 927 (5th Cir. 1952). It was therefore proper for the judge here to rely upon the 1974 decision of the trial judge and deny this 1980 motion without a hearing.

## IV. THE SUPPORTING EVIDENCE

■ An *independent* reason for rejecting Kearney's motion rests upon the existence of *conclusive evidence of his guilt*, which is not attacked, and which causes us to conclude that on the entire record there is no risk of a fundamental miscarriage of justice. *United States v. Frady, supra*, —— U.S. at ——, 102 S.Ct. at 1596. The testimony at trial proved beyond a reasonable doubt that Officer Silvia was shot at about 10:30 or 11:30 p. m. on Thanksgiving Day, November 23, 1967. Positive physical evidence, in the form of Kearney's palm prints *inside* the car, and Silvia's description of the crime as given in his dying declaration, combined with other persuasive testimony, supported the jury's verdict that Kearney was the murderer far beyond a reasonable doubt. The defense was a claim of alibi and the only issue was the identity of the killer. At trial there was no contradiction of the palm print testimony placing Kearney inside the auto, and other evidence linking Kearney to the gun, the slugs, and the bullets, and there continues to be an absence of any physical evidence contradicting the evidence on these points.

### A. The Palm Prints

Three of Kearney's *palm* prints were found on the steering wheel *inside* the Plymouth car in which Silvia told Crooke the murderer had been sitting immediately before emerging to shoot Silvia in the stomach. The existence of these palm prints *inside* the car is of *conclusive* significance because the car did not belong to Kearney. It belonged to a third person (Callaghan), unknown by Kearney, who had no prior relationship with him. Moreover, Kearney had been observed moments before by Officer Silvia affecting an illegal entry into the locked car by breaking the glass in the door. Since (1) the car was not his, (2) he never had prior access to the inside of the car, and (3) he was observed at the critical time effecting an illegal entry, the unrefuted physical evidence of his palm prints at three locations *inside* the car is practically conclusive evidence that it was Kearney who *was* present at the time and place in question. And there is no contradiction whatsoever of the evidence and testimony that the man who effected the illegal entry into the car, and who was inside the car when Officer Silvia approached, was the person who emerged and shot Officer Silvia. Kearney's palm prints inside the car prove conclusively that he was that man.

### B. The Blood Stains

In gaining entry into the car, when Kearney broke the window glass in the door, he may have cut himself, as some blood stains were found in the glove compartment. Laboratory tests of this blood indicated type A, which *matched* Kearney's type. This is not conclusive evidence, but it proves that Kearney might have been the

one who was inside the car and left the blood stains.

## C. *The Revolver and the Bullet Slugs*

Additional testimony proved that Kearney did have a .38 caliber revolver on the day of the murder, which was the caliber of the gun that killed Officer Silvia. A friend of Kearney's testified that on the day of the murder he saw Kearney with a .38 revolver (Tr. 177–78, 830), that Kearney told him he had obtained the gun on November 20th, and that he, the friend, had unsuccessfully tried to buy the gun from Kearney. Additional evidence tying the gun to Kearney and the murder was presented in the form of three slugs from a .38 caliber revolver. As stated above, one slug was obtained from the front door in the house where Kearney lived. Another was obtained from a log that Kearney had fired the .38 into *in the presence of his friend.*[3] The other slug was fired into Silvia's stomach and caused his death. An additional .38 caliber *unfired* bullet was obtained from a dresser in Kearney's room. The slugs were too mutilated to determine positively that they were fired from the same gun, but ballistics tests indicated the slugs bore sufficient rifling impressions to indicate *they were all fired* from the same type weapon,[4] a .38 caliber revolver. Also, the slugs and the bullet had a unique copper coating, as did the whole bullet retrieved from Kearney's room, and they were all manufactured by the same company.

## D. *Analysis of the Testimony and Evidence*

The defendant could not, and did not, effectively attack the positive palm print testimony, and his argument completely *ignores* the persuasive testimony of Detective Crooke reciting the dying declaration of

Officer Silvia as to the shooting and the circumstances that led up to it. (Tr. 901–940).

On appeal the testimony must be considered most strongly in support of the jury's verdict. *Koolish v. United States,* 340 F.2d 513, 519 (8th Cir.), *cert. denied,* 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724 (1965). No different rule applies to a section 2255 proceeding. Here, the evidence overwhelmingly supports the jury finding that Kearney was guilty beyond a reasonable doubt of murdering Officer Silvia. Consequently, no miscarriage of justice appears and Kearney's conviction must stand. Any argument that the conviction should be reversed because *Warren's* testimony was not believable is clearly unpersuasive. (See part V *infra*). The independent *corroborative* evidence just reviewed is so detailed and compelling that it constitutes conclusive testimony of Kearney's guilt without Warren's testimony. Kearney's claim here to the contrary, then, was properly dismissed by the District Court on the basis of such conclusive testimony. In addition the testimonial corroboration of all the details in the trial record by Warren's trial testimony disproves Warren's completely generalized, conclusory and belated affidavit that his statement when he voluntarily went to the police, and his testimony at trial were untrue.[5] See discussion, *infra,* at 222–224.

## V. THE PRIOR DECISION

■ Kearney's motion also must be rejected because the underlying claims were previously litigated on the merits and were decided adversely to him.

Part of Kearney's attack on Warren's testimony is based on a claim that he used narcotics; but the defense claimed to have such knowledge at the time of the trial, *i.e.*:

---

**3.** See comment at n.4.

**4.** The testimony that all three slugs were fired from the same type gun, when combined with the testimony that Kearney was observed to fire the shot into the log from which that slug was extracted, is exceptionally strong evidence identifying Kearney as possessor of the gun on

the day in question and as the assailant of Silvia.

**5.** We are in complete accord here with our holding on this point in Kearney's original appeal in 1969. *See United States v. Kearney, supra,* 420 F.2d at 174.

"Defense counsel: ... We have information that he is a narcotics user." 420 F.2d at 172. The trial court did not preclude the defense from examining on that issue. All it did, as this court ruled, was to "defer cross-examination pending establishment of a foundation for the questions." 420 F.2d at 174. That Crooke was not subsequently cross-examined by the defense on whether Warren was under the influence of narcotics when he gave his statement implicating Kearney, cannot now be magnified into error.

The claim of narcotics use and perjury are interwoven in the current briefs to attack Warren's identification testimony; but there is no allegation that the government *knowingly* used perjured testimony. This is not a case where there is any direct allegation of the knowing use by the government of perjured testimony. Even if Kearney's claim be "liberally construed" to include such knowing use, however, *see Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the same issue was implicitly involved in the section 2255 proceeding in 1972 to the same exact extent as it is now, and it was decided adversely to Kearney at that time. No new evidence is claimed to exist or is presented in this second section 2255 proceeding. In the absence of such a showing no relief can be granted at this stage on that ground. *Elliott v. Beto*, 474 F.2d 856, 857 (5th Cir.), *cert. denied*, 411 U.S. 985, 93 S.Ct. 2284, 36 L.Ed.2d 963 (1973); *Griffin v. United States*, 258 F.2d 411, 412 (D.C.Cir.), *cert. denied*, 357 U.S. 922, 78 S.Ct. 1363, 2 L.Ed.2d 1366 (1958).

We always have authority to set aside a conviction in the interests of justice, 28 U.S.C. § 2106, Fed.R.Crim.P., 33, but the facts we find here fall far short of supporting such disposition. In fact, they support a determination to deny such motion.

The claim of perjury here is a repetition of the same claim made in the 1973 section 2255 proceeding and denied by the trial judge. Essentially it relies on the old affidavit with no new support. The strength of this claim has not improved with the passage of seven years and should in any regard be denied as a successive claim. *Sanders v. United States*, 373 U.S. 1, 9, 83 S.Ct. 1068, 1074, 10 L.Ed.2d 148 (1963).[6] The Federal Rule governing proceedings under 28 U.S.C. § 2255 provides:

a second or successive motion may be dismissed if the judge finds that it fails

---

**6.** Justice Brennan remarked in *Sanders*:

A prisoner whose motion under § 2255 is denied will often file another, sometimes many successive motions. We are aware that in consequence the question whether to grant a hearing on a successive motion can be troublesome—particularly when the motion is prepared without the assistance of counsel and contains matter extraneous to the prisoner's case. But the problem is not new, and our decisions under habeas corpus have identified situations where denial without hearing is proper even though a second or successive application states a claim for relief. One such situation is that involved in *Salinger v. Loisel*, [265 U.S. 224, 44 S.Ct. 519, 68 L.Ed. 989] *supra*. There, a first application for habeas corpus had been denied, after hearing, by one District Court, and the denial was affirmed by the Court of Appeals. The prisoner then filed subsequent applications, all identical to the first, in a different District Court. We indicated that the subsequent applications might properly have been denied simply on the basis that the first denial had followed a full hearing on the merits. We there announced a governing principle; while reaffirming the inapplicability of *res judicata* to habeas, we said: "each application is to be disposed of in the exercise of a sound judicial discretion guided and controlled by a consideration of whatever has a rational bearing on the propriety of the discharge sought. Among the matters which may be considered, and even given controlling weight, are ... a prior refusal to discharge on a like application." 265 U.S. at 231 [44 S.Ct. at 521]. The Court quoted approvingly from Mr. Justice Field's opinion in *Ex parte Cuddy, supra*, [40 F.] at 66 [ (9th Cir.) ]: " 'The action of the court or justice on the second application will naturally be affected to some degree by the character of the court or officer to whom the first application was made, and the fullness of the consideration given to it.' " 265 U.S. at 231–232 [44 S.Ct. at 521–22]. The petitioner's successive applications were properly denied because he sought to retry a claim previously fully considered and decided against him. Similarly, nothing in § 2255 requires that a sentencing court grant a hearing on a successive motion alleging a ground for relief already fully considered on a prior motion and decided against the prisoner.

to allege new or different grounds for relief and the prior determination was on the merits.

As indicated above, *supra*, pp. 217–218, the 1974 denial of Kearney's section 2255 proceeding, which ruled on Warren's affidavit, was on the merits. Therefore, it could have been appealed by petitioner, but he did not do so. The decision thus became final and under the Rule cannot be successfully challenged now, seven years later, unless shown to be "in the interest of justice." Complete analysis does not support such a finding.

In *Laughlin v. United States*, 474 F.2d 444 (D.C.Cir.1972), *cert. denied*, 412 U.S. 941, 93 S.Ct. 2784, 37 L.Ed.2d 402 (1973), we held that for any ground of relief presented in a prior section 2255 proceeding that was determined on the merits thereof, redetermination of that ground was dependent upon the judge's exercise of his sound discretion to find that the ends of justice would be served thereby. Accordingly, a reversal of such decision on such grounds must rest only upon a finding of abuse of that discretion. With respect to requiring a hearing we stated: "[N]o hearing is required where the District Court finds that the files and records of the case conclusively determine the issues raised, or that the grounds for relief have been previously determined on the merits and the ends of justice do not require redetermination." 474 F.2d at 452.

In Kearney's first section 2255 proceeding, which included the present perjury claim based on Warren's affidavit, the trial court found that the files and records of the case conclusively determined the issues raised adversely to Kearney.[7] Our opinion in *Thornton v. United States*, 368 F.2d 822 (D.C.Cir.1966), by Judge Leventhal, states: "the normal and customary method of correcting trial errors, even as to constitutional questions, is by appeal, and [section 2255] cannot serve as a substitute for the regular judicial process of trial and appeal in the absence of circumstances indicating collateral attack is needed to provide an effective means of preserving constitutional rights." *Id.* at 825–26. *United States v. Frady*, *supra*, —— U.S. at ——, 102 S.Ct. at 1593 is to the same effect.

■ It is also significant that there is no claim that Warren was under the influence of narcotics *at trial* when he testified and identified Kearney and repeated under oath the statement he had voluntarily given to officer Crooke. Also, to the extent that Kearney may claim incompetence of counsel, it is not justified in the absence of a showing of specific facts to indicate serious incompetence. *United States v. Decoster* (Decoster III), 624 F.2d 196, 206 (D.C.Cir. 1979) (en banc) (a direct appeal case); *Scott v. United States*, 427 F.2d 609 (D.C.Cir. 1979); *Bruce v. United States*, 379 F.2d 113 (D.C.Cir.1967); *Mitchell v. United States*, 259 F.2d 787 (D.C.Cir.), *cert. denied*, 358 U.S. 850, 79 S.Ct. 81, 3 L.Ed.2d 86 (1958).

## VI. INTERNAL EVIDENTIARY CORPORATION OF WARREN'S TRIAL TESTIMONY

■ Finally, the record testimony of Warren, and Officer Silvia's dying declara-

---

7. Appellant suggests the relevance of *Davis v. United States*, 210 F.2d 118 (8th Cir. 1954), a case involving one of the Bremer kidnappers, which was remanded for hearing because the courtroom clerk had not noted in the court's minutes that Volney Davis in entering his guilty plea had waived his right to counsel. If it had been proven that he did not properly waive his right to counsel, that fact would have *conclusively* entitled him to a new trial. However, appellant here makes no attack whatsoever on the physical evidence that, with other uncontroverted evidence, *conclusively* proves his guilt; and five years after he was sentenced the same point was argued and denied on the full record by the judge who presided at the initial trial. Thus, *Davis* is inapposite. Inci-

dentally, the memorandum order of the trial court on the remand hearing found Davis' claim to be false, and, when he pled guilty before Judge Matthew M. Joyce on June 3, 1955, that "he competently, intelligently, and understandingly waived his constitutional rights to be represented by counsel under the Sixth Amendment to the Constitution of the United States, with a full understanding of the implications thereof." Order of Chief Judge Gunnar H. Nordbye, D.C.Minn. No. 6096 Cr. August 11, 1954. *Aff'd, Davis v. United States*, 226 F.2d 834 (8th Cir. 1955), *cert. denied*, 351 U.S. 912, 76 S.Ct. 702, 100 L.Ed. 1446 (1956). The case is a good illustration of prisoners bringing grossly untimely claims that are false.

tion,[8] which were part of the testimony the trial judge ruled on in denying the first section 2255 motion, are *exactly* the same on so many intricate factual details of the offense and the surrounding circumstances, involving timing, movements, location, description of tangible objects, even subjective causation for acts by individuals and practically every material fact to which Warren testified, that the claim in Warren's affidavit that he was not present when the murder was committed and did not see Kearney shoot Silvia as he voluntarily told the police, gave them a signed statement (Dft. Ex 1, Govt. Ex H) and testified in court, is completely destroyed.[9]

Crooke testified as to a "second subject [who] ... approached the car" in which Kearney was seated (Tr. 327) and Warren and Crooke gave *identical testimony* on the following details:

The time of the murder was between 10:30 and 10:45 p. m. on November 23, 1967 (Tr. 35); Kearney was in a red and white Chevrolet, mostly white, when he waved to Warren as Warren was passing by (Tr. 36); Kearney was seated on the driver's side (Tr. 37) and Warren talked to him through a broken vent window on the passenger side of the car (Tr. 38); the police car was a white Plymouth (Tr. 38), located at 16th and Corcoran on the east side of the street (Tr. 39); [as Officer Silvia suspected] Warren did alert Kearney to the police presence (Silvia) in his car at 16th and Corcoran (Tr. 38–39 cf. 327)[10] and the police car left 16th &

8. Crooke testified to the description of the events as recited to him by Officer Silvia on his death bed, and the testimony was held to be validly admitted as a spontaneous utterance and a dying declaration. He was not cross-examined. (Tr. 332)

9. Warren also testified before the Grand Jury and the defense was given a transcript of that testimony. (Tr. 105) If there was any inconsistency between his grand jury testimony, and his testimony at trial, defense counsel, who tried the case in a very alert manner, would surely have called it to the attention of the jury. It is also significant that there is no claim that Warren was under the influence of narcotics when he testified before the grand jury or that his testimony here was false in any respect.

10. The similarity and exactness of this testimony by Warren and Crooke, involving the thought process of Officer Silvia, and Warren's confirming testimony that he had alerted Kearney to the police car (roller) at the corner, as Silvia had *suspected*, is extremely persuasive if not absolutely conclusive of Warren's presence at the scene of the crime.

Officer Crooke testified that Officer Silvia on his death bed told him:

"He said he continued [from 16th and Corcoran] watching [the man who had broken the window and entered the Chevrolet], and suddenly coming from an easterly direction of this car on Corcoran Street was a second subject. The subject approached the car, and Silvia said the man opened the door and said something to the man who was in the car.

Silvia said at this point *he felt that he was made, that the second man had spotted him.* So he decided to move in. He said he pulled the police car in behind the Chevrolet on an angle into Corcoran Street and got out of the car and took his flashlight with him and he

has his badge." (Tr. 327) [emphasis added].

[Warren's testimony thus corroborated Silvia's suspicion, that Warren had alerted Kearney to the presence of the police car (with Silvia) across the corner, by the following testimony:]

Q Would you tell His Honor and the Jury what you said to Lawrence Kearney when you approached him and talked to him from the broken vent window.

A I told him that a police car was on the corner.

Q What word did you use when you said "police car"?

A Roller.

Q What do you mean by "roller"?

A Police car.

Q When you told Kearney that a roller was there, was any answer made by Kearney after you had told him that?

A No.

Q Did you tell him again, did you repeat it again?

A Yes.

Q When you saw this police car, were you able to identify it as a police car?

A Yes.

Q How were you able to identify it?

A By a radio aerial on the top of the car.

Q What type of car was this police car?

A A white Plymouth.

Q Whereabouts was this police car, the white Plymouth, at the time you told Kearney about it?

A On the corner of 16th Street.

Q On which side of 16th Street was it, on the east or the west side? Do you recall, in relation to the car that Kearney was in, the Chevrolet, on which side was it on 16th Street?

A I guess the east side.

Corcoran a few minutes after Warren first observed it (Tr. 41); Warren identified the Chevrolet by its Connecticut tags (Tr. 42); he saw the broken vent in the window on the passenger side (Tr. 43); Officer Silvia (the murdered officer) pulled his car around near the car in which Kearney was seated, got out and asked Kearney who was behind the wheel of the Chevrolet, for his identification (Tr. 44); Officer Silvia got out of his car and pointed his flashlight at his wallet which he was carrying in his hand. The wallet contained his identification (Tr. 45–46); Officer Silvia then walked around behind the Chevrolet (Tr. 47) and Kearney slid over to the passenger side and got out of the car from that side and stood near the sidewalk (Tr. 48); shortly thereafter Kearney went into his pants, pulled the gun and shot Officer Silvia (Tr. 49); Warren then ran up Corcoran Street [they fled East on Corcoran Street] (Tr. 50, 328); Officer Silvia was wearing a white trench coat which was identified as exhibit 4 (Tr. 51). Compare with Officer Crooke's testimony (Tr. 324–328).

Transcript references are to Warren's testimony at trial. *Cf.* Tr. 953–955 to the same effect.

Warren's statement that Kearney shot Silvia from "three to four feet" away is also corroborated by the testimony of the FBI firearms expert based on his analysis of the effect of the discharge of the gun on the all-type weather coat then being worn by Silvia. (Tr. 49, 453). The transcript, *files and record were thus more than adequate five years after the shooting for the trial judge to refuse to credit Warren's recanting affidavit alleging a belated claim of perjury in the face of the practically conclusive testimony identifying Kearney as the assailant, i.e., the testimony as to the palm prints, the gun and slugs, the blood tests, the corroborated distance from which Silvia was shot, and the mosaic corroboration of Warren's and Crooke's testimony of the most minute details surrounding the shooting.*

Warren's presence at the murder, and his conflicting statements thereon, were also matters that were the subject of extensive cross examination at trial, but the defense completely refused to cross examine Warren as to the *details* of the actual shooting to which he had testified. (Tr. 7/24/68, p. 84–128).

The case is thus one where the "files and records conclusively [support the trial judge's decision] that the prisoner [was] entitled to no relief," 28 U.S.C. § 2255. And, since Kearney's claim had previously been denied on the merits by the judge who heard the witnesses at trial, and who relied heavily on the analysis and reasoning of the appellate panel that affirmed the conviction four years earlier, there is no necessity seven years later to grant a hearing or to do other than deny the motion to the extent that it was based on claims previously raised and denied. *See Hardy v. United States*, 381 F.2d 941, 943 (D.C.Cir.1967); *McGuinn v. United States*, 239 F.2d 449, 451 (D.C.Cir.), *cert. denied*, 353 U.S. 942, 77 S.Ct. 818, 1 L.Ed.2d 762 (1957).

## VII.  CONCLUSION

This case personifies the great abuse of repetitive post conviction section 2255 proceedings that clog the courts and raise unjustified hopes in convicted criminals that a new trial years down the road from their conviction will leave the government with insufficient witnesses and evidence to again obtain a conviction for a most heinous offense. Not only was the filing in this case untimely, but because the evidence overwhelmingly supports conviction beyond a reasonable doubt, and because the section 2255 issue had already been decided adversely to Kearney on the merits, there was virtually no chance that the motion would be granted.

This decision is rendered after a complete review of the entire transcript of the original trial, on all the files, records, exhibits and all subsequent proceedings. Such examination and review compels the conclu-

sion that Kearney received a fair trial and was properly convicted on the basis of overwhelming evidence. His guilt was proved far beyond a reasonable doubt and it would not be in the interests of justice to grant his present motion as we perceive no risk whatsoever that he was improperly convicted. The subject motion, for the reasons set forth above, is accordingly denied and the ruling of the District Court is affirmed.

*Judgment accordingly.*

## APPENDIX

## OFFICE OF THE HOMICIDE SQUAD

## METROPOLITAN POLICE DEPARTMENT

## WASHINGTON, D. C.

### SUNDAY, NOVEMBER 26, 1967

RE: HOMICIDE SHOOTING of Police Officer Gilbert Silvia, Male, White, 34 years of age, Pronounced Dead at 2:10 A.M. November 25, 1967 by Dr. Paul Strong of the Washington Hospital Center staff at the Washington Hospital Center.

STATEMENT OF: STANLEY WALTER WARREN, male, negro, 16 years of age, residing 1458 Corcoran Street Northwest. Phone RO 2–7150. A student in the Tenth Grade at Cardoza High School.

\*     \*     \*

[In the first two and one-half pages of the statement Warren generally describes his activities the evening of the shooting, his going to Larry Kearney's house while a party was in progress, and his other movements, but fails to mention that he had observed the shooting of Officer Silvia. He did recite a rumor he had heard to that effect.]

Saturday afternoon about 2:00 or 2:30 PM I was out on the street and there were people in a crap game and they were saying how stupid Larry was for talking about how he had killed the Policeman. Later Saturday night I saw Larry in the back of a Police car and this morning I heard that he had been arrested for killing the Policeman.

Questions by Detective Sergeant Bernard D. Crooke:

\*     \*     \*

[The statement then recites the following:]

Q: Did anyone tell you that Larry told them that he had shot the Policeman?

A: No, I just heard them saying that he was simple for telling it.

Q: Who was in the crap game you mentioned in your statement?

A: I really don't remember.

Q: Is there anything else that you would like to mention that has not already been mentioned in this statement?

A: I might as well tell you what really happened. I was there. Everything I told you in the statement is true up to the point when I left Larry's party. When I left the party I was alone and walked to 14th Street and then over to 13th and "Que" Street. I walked back down to 13th and Corcoran Street and then straight out Corcoran Street. I was just walking and not going anyplace particular. I was walking on the even side of the street. I was walking in the 1500 block and coming toward 16th Street. As I was walking I saw three Spanish men park a yellow with a black vinal top Mustang and go into a house on the other side of the street. As I got near the corner I saw a man sitting behind the wheel of a white Chevrolet with red trim. I didn't know who it was but he started waving at me. When I got closer I saw that it was Larry sitting in the car and I saw a white Plymouth Police Cruiser sitting at the corner of 16th and Corcoran Street Northwest. The Police Cruiser was in front of the church and near the lamp post. I saw one Policeman in the cruiser.

After I saw the Policeman in the cruiser and Larry in the car I walked up to the Chevrolet and noticed that the vent window on the passenger side was broken. I talked throught [sic] the

vent window and said "Hey, there's a roller (Police Car) on the corner." I said it again and he leaned over like he couldn't hear me and was straining to hear me. He turned the radio on and had the motor running. Larry didn't look like he was going to get out of the car and I got ready to walk away and the Police Cruiser pulled up behind the car Larry was in. The Policeman got out and walked up to the driver's side and asked Larry if it was his car and Larry told him that it was, he said "Yes." The Policeman then pulled out his flashlight and his badge and was holding them in front of him and asked Larry for some identification. Larry slid across the seat and came out the passenger side of the car. The Officer said "You don't have to get out, just show me some identification." Larry was out of the car then and the officer walked around the car and when he walked toward us he nodded his head to me. I said "Hey" and nodded back.

At this time Larry said "I'm going to show you my identification." He said this when he got out of the car. He opened his coat and went in his pants and turned to the side and then pulled out a gun and shot him. The Policeman had his badge and flashlight in his hands and grabbed his side and said "Oh, God." The Policeman then fell.

I said "God Dam" and ran. I didn't see what happened after that and I don't know what Larry did. I ran down to 15th Street and then to "Que" street and then down to my cousin's house at 1428 "Que" Street. My cousin wasn't there then but when he came in I told him what happened. He told that it was alright for me to stay there and if they caught Larry I should tell you all the truth. The rest of the statement that I gave is the truth, we did go to the Chili Bowel. When I saw Larry yesterday I asked him about the car tape and that is true and Larry told me that "the Policeman died." We didn't say anymore about it.

Questions by Detective Sergeant Bernard D. Crooke:

Q: Did you hear the Detective say he was a Policeman?

A: He didn't say it.

Q: Did he flash his flashlight on his badge when he showed it to Larry?

A: I didn't see the badge, all I saw was his Identification card.

Q: Did you see the Policeman with his revolver at at anytime?

A: No.

Q: What was the Policeman doing when Larry fired the shot?

A: Just standing there.

Q: How many shots were fired?

A: One.

Q: How close was Larry to the Policeman when he shot the Policeman?

A: Three feet may be not that far.

Q: Describe the gun Larry shot the Policeman with?

A: I couldn't see it because it was dark but it looked like a old gun.

Q: Have you ever seen Larry with a gun before?

A: No.

Q: What happened to the gun that Larry used in the shooting?

A: I don't know.

Q: I now show you a photograph of a male subject, do you know this Man?

A: That's Larry, the one who was in the car and shot the Policeman.

NOTE: Photograph of Larry Kearney taken after his arrest.

Q: What was Larry wearing after the shooting or I should say at the shooting?

A: He had a hat on but not the same one he had on when he was arrested. He had a suburband [sic] coat on with a wool trimmed collar. I don't know what color it was because it was dark.

Q: Do you know where this hat and coat are now?

A: I don't know.

Q: How was the Chevrolet parked that you saw Larry in before the shooting?

A: It was parked to near the corner, you know, he should have got a ticket for parking there.

Q: Did you see how the vent window on the passenger was broken?

A: It was already broken when I got there.

Q: Did you see anyone else in the auto other than Larry?

A: No.

Q: Did you see anyone else in the area at the time of shooting?

A: Just the Spanish people going in the house when I was walking toward 16th street.

Q: What were you wearing at the time of the shooting?

A: I was wearing a plaid round brim hat and a white trench coat. I was wearing brown loafers.

Q: How many persons did you tell what you saw concerning the shooting of the Policeman.

A: Only my cousin, Rezan Taylor.

Q: Do you know of anyone that Larry told about the shooting?

A: No.

Q: Do you know or heard what Larry may have put the gun?

A: No.

Q: Do you know if Larry has any keys that he uses on cars?

A: I don't know.

Q: Had you seen the Chevrolet that Larry was in prior to this date?

A: Yes.

Q: When did you see the car?

A: I had seen that car there this past Monday and Tuesday.

Q: How do you know it was the same car?

A: It had out of state tags.

Q: Did you notice if the vent window was broken on Monday and Tuesday?

A: No.

Q: Did you see any injuries on Larry, was he bleeding anywhere?

A: Not that I could see.

Q: Why did you wait until the end of the original statement to tell what you know about the shooting of Detective Gilbert Silvia?

A: It would have came out sooner or later.

Q: Did you assist Larry Kearney in anyway on the night of the shooting of Detective Silvia or at anytime after the shooting?

A: No.

Q: Is there anything you would like to add to this statement that has not already been covered?

A: No.

Statement given to and typed by Detective Sergeant Bernard D. Crooke

WITNESSED

/s/ Det. Sgt. Bernard D. Crooke

/s/ Det. William Mann

/s/ Stanley Walter Warren

[Warren's initials and those of Detective Crooke appear on each page of Warren's statement.]

TAMM, Circuit Judge, concurring in part:

The issue presented by this appeal is whether the district court erred in failing to hold a hearing on the claims presented in Kearney's 1980 motion. I agree that the district court's decision in this case should be affirmed. For the reasons set forth below, however, there is much in the analysis employed by the majority with which I cannot agree.

I.

It is well settled that pro se prisoners' pleadings should be liberally construed. *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972). It is also manifest that timeliness is never an issue *per se* in section 2255 proceedings because such a motion may be filed "at any time." 28 U.S.C. § 2255 (1976). I therefore cannot agree with the majority that some portions of Kearney's motion should be construed to be an untimely motion for a new trial. Although I agree that the timing of Kearney's filings is relevant to certain equitable considerations that arise in

section 2255 cases, I believe the majority's discussion of motions for a new trial is irrelevant in the current context. In addition, I find no nexus between the case at hand and the majority's discussion of claims of newly discovered evidence and claims based upon affidavits of recanting witnesses. If this case involved simply a recanting witness and a claim of newly discovered evidence, I believe that its resolution would be a simple matter. Claims of newly discovered evidence, without more, are not cognizable under section 2255. *See Davis v. United States*, 417 U.S. 333, 346, 94 S.Ct. 2298, 2305, 41 L.Ed.2d 109 (1974); *Howard v. United States*, 580 F.2d 716, 720 (5th Cir. 1978). *See also Pelegrina v. United States*, 601 F.2d 18, 19 n.2 (1st Cir. 1979), and cases cited therein. This is *not* such a case, however, Kearney contends that, liberally construed, his motion presents a claim of *the knowing use by the government of perjured testimony*. The question we confront is whether this due process claim required a hearing.

## II.

The majority finds that the evidence adduced at Kearney's trial, even excluding Warren's eyewitness identification testimony, showed appellant's guilt beyond a reasonable doubt. In the face of such conclusive evidence, the majority reasons, no hearing was required on the section 2255 motion because Kearney would be entitled to no relief regardless of the truth of his allegations. If it is assumed that Kearney sufficiently alleged a due process claim of the knowing use of perjured testimony, however, the appropriate standard used to determine whether Kearney would be entitled to relief if his claim proved true is whether "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." *Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959). This is indisputably a high standard; the majority does not employ it. I doubt whether it can be said that there is

*no reasonable likelihood* that the testimony of an *eyewitness* to a murder, positively identifying the defendant as the murderer, affected the judgment of the jury. *See Dupart v. United States*, 541 F.2d 1148, 1150 (5th Cir. 1976). Accordingly, I cannot agree that the unavailability of ultimate relief is a proper basis for concluding that no hearing was required in this case.

## III.

The majority opinion relies heavily on the denial of the prior section 2255 motion as a determination of the merits of the claim of knowing use of perjured testimony that was properly given controlling weight by the district court. I find it far from clear, however, that the 1974 denial on this issue was a "merits determination." In 1974, the district court concluded "[t]hat the claims of error respecting manufactured evidence [and] the prosecutor's knowing use of perjured testimony . . . taken in light of the pleadings and record [were] *mere conclusions without supporting facts*," and that the motions, pleadings, files and records conclusively show[ed] that petitioner [was] entitled to no relief." *Kearney v. United States*, Civ. No. 74–213 (D.D.C. Feb. 12, 1974) (order denying section 2255 motion); Record (R.) at 40, pg. 2. The wording of the district court's order makes it unclear whether the 1973 perjury claim was disposed of on its merits. On one hand, the judge found that the perjury allegation was not sufficiently pleaded to form the subject of a merits ruling; on the other hand, he appeared as well to rule that Kearney was entitled to relief on *none* of his claims, including, at least arguably, the perjury charge. In *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), the Supreme Court held that a district court may give controlling weight to the denial of a prior section 2255 motion "*only if* (1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) *the prior determination was on the merits*, and

(3) the ends of justice would not be served by reaching the merits of the subsequent application." 373 U.S. at 15, 83 S.Ct. at 1077 (emphasis added).

Assuming that the section 2255 motion filed in 1973 sufficiently alleged the knowing use of perjured testimony by the prosecutor, the district court's holding in 1974 that the issue was conclusively resolved on the basis of the record appears to have been erroneous. A sufficiently alleged claim of the knowing use of perjured testimony involves facts outside the trial record and thus requires an evidentiary hearing. *See Smith v. United States*, 618 F.2d 507, 510 (8th Cir. 1980); *Lindhorst v. United States*, 585 F.2d 361, 365 (8th Cir. 1978); *United States v. Vecchiarello*, 536 F.2d 420, 424 (D.C.Cir.1976); *United States v. Maturo*, 536 F.2d 427, 428 (D.C.Cir.1976). Under *Sanders*, it seems clear that the "interests of justice" standard would require, at the very least, some ground other than the successive motion rationale to support a denial without a hearing of the 1980 motion. On the other hand, if it is assumed that in 1974 the district court found that the due process claim had not been sufficiently alleged, then there was no "merits" determination of that issue. On this view, there having been no merits consideration, if the 1980 motion contained sufficient allegations, *Sanders* would require a ruling that the denial of the 1980 motion as successive was erroneous.

I believe that a good possibility exists that the knowing use of perjury claim was not considered at all, and, if considered, that the decision in 1974 to deny the claim without a hearing was erroneous. The majority concludes that the 1974 claim was properly denied on the merits. Where, as here, the basis for the denial of a prior motion is unclear, I believe that the court is required to resolve any doubt in favor of the pro se applicant. *Cf. Sanders*, 373 U.S. at 16, 83 S.Ct. at 1077 (if doubt arises whether a ground for relief alleged in a successive motion is the same ground alleged in a prior motion, doubt should be resolved in favor of the applicant). Accordingly, I believe that the majority's extensive discussion of possible bases upon which the 1974 district court could have found that the files and records conclusively showed that Kearney was entitled to no relief to be unnecessary. It is clear to me that the 1974 ruling should not be treated as a merits determination and that this court should consider the claims raised in the 1980 motion to determine whether they required a hearing.

### IV.

On appeal, court-appointed counsel has presented several serious due process claims.[1] I do not believe, however, that the claims pressed are sufficiently alleged in the motion itself. The motion states: "Denial of due process. Fifth Amenbment [sic] Violation ... That STANLEY W. WARREN'S, COnfession [sic] was coersed [sic] and obtained under duress and that it was

---

1. In addition to the knowing use of perjured testimony claim, appellant's counsel states that "fairly read" the § 2255 motion alleges that due process was violated if, as Warren alleges, his written statement was obtained by coercion and duress. Although the use of coerced statements is abhorrent to our criminal justice system, cases that have disallowed their use are clearly distinguishable from the case at bar. The prosecutor normally attempts to admit allegedly coerced statements in order to show a prior admission of guilt by a defendant who now claims innocence, *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), or to impeach a witness whose trial testimony is at variance with a prior statement, *LaFrance v. Bohlinger*, 499 F.2d 29 (1st Cir. 1974). In the case at hand, however, the alleged involuntary statement was interjected into the trial *by Kearney's counsel* in order to impeach the witness Warren. As the majority notes at 12, the statement was never introduced into evidence. In addition, at no time during the trial was it alleged that the statement was involuntarily given. Accordingly, the belated allegations of coercion do not affect the admissibility of Warren's trial testimony that defense counsel unsuccessfully sought to impeach. Because no relief on this claim is available regardless of the truth of the allegation, no hearing on this issue was required.

erronious [sic] and perjured testamony [sic]." *United States v. Kearney*, Crim. No. 1537–67, Motion to Vacate, Set Aside, or Correct Sentence at 4 (D.D.C.); R. at 43. Although the motion is supported by the affidavit of Warren stating that he committed perjury, there is no allegation whatsoever that the prosecutor was aware of the alleged perjury. The motion, therefore, does not sufficiently allege a due process violation.[2] *See United States v. Conzemius*, 611 F.2d 695, 697 (8th Cir. 1979); *Scott v. United States*, 545 F.2d 1116, 1117 (8th Cir. 1976), *cert. denied*, 429 U.S. 1111, 97 S.Ct. 1128, 51 L.Ed.2d 565 (1977). Even construing the documents to raise such a claim, there is nothing more than the bare conclusion of prosecutorial knowledge. Conclusory statements, alleging no facts in support and pointing to no facts from which supporting inferences can be drawn, are insufficient to require a hearing. *See United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1980), *cert. denied*, 451 U.S. 938, 101 S.Ct. 2018 (1981); *DeVincent v. United States*, 602 F.2d 1006, 1009 (1st Cir. 1979). In addition, even if Kearney had alleged supporting facts in the 1980 motion, it is doubtful that the motion would have been saved from a fully justified denial with a hearing. *See United States v. Romano*, 516 F.2d 768, 771 (2d Cir.), *cert. denied*, 423 U.S. 994, 96 S.Ct. 420, 46 L.Ed.2d 368 (1975). Accordingly, I agree that the district court's decision in this case should be affirmed.

---

**2.** The majority opinion notes that the motion does not allege prosecutorial knowledge of the alleged perjury. *See* Majority Opinion at 222–223. Insofar as the decision rests on this determination, I concur.