**Andre C. DERRINGTON, Appellant,**

v.

**UNITED STATES, Appellee.**

**Stanley M. GRAYSON, Jr., Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 80–166, 80–458 and 80–1155.**

District of Columbia Court of Appeals.

Argued March 27, 1984.

Decided Feb. 21, 1985.

---

Mark Carlin, Washington, D.C., for appellant A.C. Derrington.

Gregory B. Macaulay, Washington, D.C., for appellant S.M. Grayson.

Craig N. Moore, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, and Michael W. Farrell, Thomas J. Tourish, Jr., and David W. Stanley, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before PRYOR, Chief Judge, and NEBEKER and ROGERS, Associate Judges.

ROGERS, Associate Judge:

In these consolidated appeals, each appellant appeals his conviction by a jury of first-degree murder while armed (D.C.Code §§ 22–2401, –3202 (1981)), first-degree felony murder (in the course of two robberies), while armed (D.C.Code §§ 22–2401, –3202 (1981)), two counts of armed robbery (D.C. Code §§ 22–2901, –3202 (1981)). Appellant Grayson also appeals his conviction of possession of a prohibited weapon (D.C.Code § 22–3214(a) (1981), and appellant Derrington appeals the denial of his motion for a new trial or, alternatively, to vacate the judgment.[1] Grayson contends that his warrantless arrest violated the Fourth Amendment and that certain evidence was obtained in violation of his Miranda[2] rights under the Fifth Amendment. According the appropriate weight to the trial court's findings, we affirm the trial court's ruling that exigent circumstances justified Grayson's warrantless arrest. However, upon a review of the record, we hold that Grayson's Miranda rights were not "scrupulously honored" as required by Michigan v. Mosley,[3] and hence the trial court's failure to suppress his statements was error. Nevertheless, in accordance with the decision of this court to apply the Chapman[4] standard to Miranda violations, we hold the error was harmless beyond a reasonable doubt in view of Grayson's pre-arrest admissions, other corroborating testimony and incriminating physical evidence. Turning to Derrington's claims that the verdict may not have been unanimous, that prejudicial inadmissible hearsay and improperly admitted "other crimes" evidence denied him a fair trial, and that the trial court erred in denying without a hearing his motion for a new trial or, alternatively, to vacate his sentence, we find them unpersuasive. Accordingly, we affirm appellants' convictions except for one count of armed robbery which merged with the conviction for felony murder, Whalen v. United States,[5] and remand to the trial court with instructions to vacate those convictions and to resentence appellants accordingly. Brown v. United States, 464 A.2d 120, 125–26 n. 7 (D.C.1983).

I.

Carl Metheny was robbed and murdered by three men on Wednesday, February 28, 1979, around 7:30 p.m. when he and his wife were approaching their car in an underground garage. Mrs. Metheny had seen the three men standing outside of Mr. Metheny's liquor store at 17th & I Streets, N.W. shortly before she and her husband

---

1. These appeals were consolidated by orders of this court, November 11, 1980, and October 27, 1982.

2. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

4. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

5. 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980). Appellants were each sentenced to 20 years to life on each murder conviction (to be served concurrently); 5 to 15 years on each armed robbery conviction (to be served consecutively to each other and to the sentences for murder). Grayson was sentenced to 3 to 9 years for possession of a weapon (to be served concurrently with armed robbery sentences).

went to the garage. When they saw the men in the garage, Mr. Metheny assisted his wife into the car and put his attache case in the car. As he walked toward the driver's side, he was shot in the head with a shotgun held by a man wearing glasses and a trench coat, and died shortly thereafter. The men fled after the gunman took Mr. Metheny's attache case and Mrs. Metheny's purse.

The following afternoon the police received a call from a man who advised that his son, Ronnie Melson, knew about the killing. Later that evening Ronnie Melson told Detective Green of the homicide branch that several people were involved in planning the armed robbery, including one whom he knew as "June," who carried a sawed-off shotgun in a gym bag. Melson told Green what he knew about appellants' planning of the robbery, and that "June" had told him that morning what had happened, including the fact he had shot a man, and also showed Melson a lot of money from the robbery; Melson thought it was about eight hundred dollars. After Melson identified "June" as appellant Grayson from a photo array and told the police where he lived, Detective Green and other police officers arrested Grayson in his mother's apartment. They also seized his sawed-off shotgun, gym bag, coat, and eyeglasses as well as money on his bureau. About thirty minutes later, Detective Green and his partner spoke with Grayson in the homicide office and obtained oral and written statements from him. Green proceeded early the next morning to interview another acquaintance of Melson named Johnny Holland, who had originally planned to join in the robbery, and William Wright at whose apartment Derrington was living. Holland was arrested, and gave a statement to the police about his involvement with appellants in planning the robbery, and about what Grayson had told him over the telephone on the day after the shooting and robbery. Wright told Detec-

tive Green about the activities of appellants and two others at his apartment on the day of the crimes, but denied he was personally involved; he turned over Mr. Metheny's attache case, a paper bag like the one Mr. Metheny used for the liquor store's receipts, and some of the robbery money. Appellant Derrington's fingerprints were found on the paper bag, and he was arrested later the same day.

At the trial, following the denial of Grayson's pretrial motion to suppress, the government presented evidence which included Detective Green's testimony about Grayson's statements after his arrest[6] and the physical evidence seized from his bedroom. Neither appellant testified. Derrington presented an alibi defense through three friends who claimed that he was at a pool hall at the time of the crimes. Grayson did not present any evidence in his defense.

## II. Appellant Grayson

Grayson filed a pretrial motion to suppress all the fruits of his allegedly illegal warrantless arrest and the subsequent search of his dwelling, including any and all statements obtained by the police which were fruits of the illegal arrest or obtained in violation of his *Miranda* rights. He also sought to suppress as the fruits of his allegedly illegally obtained statements, the coat he had worn on the night of the crimes, a police photograph of the blister in the webbing of his hand, William Wright's testimony, and the items seized at his apartment.

### A.

▬▬ "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 588–89, 100 S.Ct. 1371, 1380, 1381, 63 L.Ed.2d 639 (1980) (the Fourth Amendment further bars

---

**6.** Grayson's statement was not introduced at trial because it could not be adequately redacted. Detective Green's testimony was limited to those

portions of the statement relating to Grayson's involvement.

police from making a warrantless, nonconsensual entry for purposes of a routine felony arrest) (citing *Dorman v. United States*, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970) (en banc)). However, there is an exception to the warrant requirement where exigent circumstances are present. *Payton, supra*, 445 U.S. at 590, 100 S.Ct. at 1382; *Dorman, supra*, 140 U.S.App. D.C. at 319, 435 F.2d at 391; *United States v. Minick*, 455 A.2d 874 (D.C.) (en banc), *cert. denied*, —— U.S. ——, 104 S.Ct. 111, 78 L.Ed.2d 112 (1983). The *Dorman* criteria for determining whether there are exigent circumstances are well settled. As summarized in *United States v. Lindsay*, 165 U.S.App.D.C. 105, 110, 506 F.2d 166, 171 (1974), they are: (1) a grave offense is involved, particularly a crime of violence; (2) the suspect is reasonably believed to be armed; (3) a clear showing of probable cause; (4) a strong reason to believe that the suspect is in the dwelling; (5) the likelihood of escape if not swiftly apprehended; (6) a peaceful entry as opposed to a "breaking"; and (7) the time of entry (night or day). The trial court concluded there were exigent circumstances. We must accept the trial court's factual determinations absent clear error. *Minick, supra*, 455 A.2d at 876 (citing *Brooks v. United States*, 367 A.2d 1297, 1302 (D.C.1976)). Applying the analysis of *Minick, supra*, 455 A.2d at 876,[7] and *Dorman, supra*, 140 U.S.App. D.C. at 320–21, 435 F.2d at 392–93 to determine whether the police actions can be upheld, we conclude the trial court carefully considered the seriousness of the intrusion and, in view of the evidence presented at the pretrial hearing, we find no reversible error in its conclusion that the warrantless entry was justified by exigent circumstances.

All but one of the *Dorman* factors are easily disposed of here. The offense involved was clearly a grave one. The police could reasonably have believed Grayson would be armed since Melson told them Grayson had the shotgun with him at home and would take it with him if he left his home. There was also a clear showing of probable cause since Melson, as a citizen reporting criminal activity,[8] provided the police with substantial evidence that Grayson had committed the crimes. Detective Green testified that several of the facts Melson related would have been known only by someone with firsthand knowledge or by someone who had spoken with the actual perpetrator. Under the totality of circumstances test of *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983), we hold there was a clear showing of probable cause. The record supports the trial court's finding that the police had strong reason to believe that Grayson was in the dwelling at the time. Although Detective Green could not remember how Melson knew Grayson was home, Green testified he was positive that Melson told him that Grayson was there at that time, and he was also sure he asked Melson how he knew and was satisfied with the answer. Finally, the peacefulness of the entry, offset the concern that the police entered at night. *Minick, supra*, 455 A.2d at 878; *Brooks, supra*, 367 A.2d at 1303.

---

7. The *Minick* analysis is:

 Analytically, the court ... address[es] four questions: (1) At what time did the police decide they had sufficient cause to pursue [the defendant]? (2) Did the police act reasonably in waiting so long to do so? (3) By the time the police were ready to move against [the defendant], were there exigent circumstances justifying a warrantless entry under *Dorman, supra*? (4) If so, did the police enter the premises without unreasonable delay?

8. Contrary to Grayson's suggestion, we do not view Melson as a confidential informant "from

the criminal milieu" but rather as a citizen reporting criminal activity, *see Rutledge v. United States*, 392 A.2d 1062, 1066 (D.C.1978), who, as Melson did, came forward on his own because, as he told Detective Green, he thought the killing (as distinct from the robberies) was wrong. At that time, Melson was not facing any pending criminal charges nor did he request anything from the police in connection with his information. The trial court so found and that finding is supported by substantial evidence in the record. D.C.Code 17–305(a) (1981).

■ Grayson contends, however, that there was no evidence he was likely to flee and, therefore, the police had time to obtain a warrant. This court has taken an expansive view of the "likelihood of escape" criterion, *Minick, supra,* 455 A.2d at 878, and "[n]ot all the indicia of exigency need be present to justify a warrantless search." *Gaulmon v. United States,* 465 A.2d 847, 850 (D.C.1983). "Under limited circumstances, the 'likelihood of escape' inquiry properly includes consideration of the probability that evidence as well as the suspect may be lost." *Brooks, supra,* 367 A.2d at 1303 and cases cited (footnote omitted). Exigency is heightened where the evidence about to be removed is a gun used to kill. *See United States v. Allison,* 205 U.S.App. D.C. 270, 272, 639 F.2d 792, 794 (1980); *United States v. Hendrix,* 194 U.S.App. D.C. 76, 79, 595 F.2d 883, 886 (1979); *cf. Rushing v. United States,* 381 A.2d 252, 256 (D.C.1977).

The evidence before the trial court was that the police did not know how long Grayson would remain at home. They were dealing with a relatively recent crime, and thought a prompt arrest might enable them to locate and recover the instrumentalities and fruits of the crime before they were disposed of. *Dorman, supra,* 140 U.S.App.D.C. at 321, 435 F.2d at 393; *cf. United States v. McEachin,* 216 U.S.App. D.C. 320, 670 F.2d 1139, 1145 (1981) (information that defendant about to dispose of shotgun which was evidence of crime which occurred three weeks prior sufficient exigent circumstances). In explaining why, after starting to prepare warrant papers, he decided to act without obtaining a warrant, Detective Green testified that he was primarily concerned about recovering the sawed-off shotgun. He knew it would take between two and three hours to get a warrant, and his experience convinced him that all the evidence would have disappeared if he had not acted very quickly. But, before proceeding without a warrant, Detective Green conferred with a senior Assistant United States Attorney and both agreed that Grayson should be arrested immediately.

■ The trial court must be guided, in making its determination of exigent circumstances, by the realities of the situation facing the police as it is presented in the record. *United States v. Robinson,* 174 U.S.App.D.C. 351, 354, 533 F.2d 578, 581 (en banc), *cert. denied,* 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976). It must also "be mindful of the danger that a preservation of the evidence rationale, if unrestrained, could undermine the Fourth Amendment's protections." *Brooks, supra,* 367 A.2d at 1303. But given the facts that the shooting and robberies were recent, and the police had obtained information that a suspect whom they had clear probable cause to arrest was, at least temporarily, at a given location with the murder weapon, and likely also to dispose of it and the robbery money, we cannot say the trial court erred in concluding that the evidence was likely to disappear if the police did not act promptly and that this provided sufficient urgency to justify a warrantless entry.

■ Lastly, the *Minick* analysis requires the court to determine whether police, confronted by exigent circumstances, entered the premises without unreasonable delay. *Minick, supra,* 455 A.2d at 881. ("Even when the *Dorman* criteria are met, the court shall not excuse the unexplained failure of the police to procure a warrant if they unreasonably delayed their investigation or entry."). Melson identified Grayson at approximately 8:45 p.m. and the police entered Grayson's mother's home a few minutes after 10:00 p.m. The trial court's finding that the police did not unreasonably delay their entry is supported by the evidence in the record. Accordingly we conclude that, consistent with our standard of review and the *Dorman* factors, a warrantless entry into Grayson's mother's apartment at 10:00 p.m. to effectuate his arrest was justified.

We also affirm the trial court's ruling that the seizure of the gym bag and its contents (the shotgun and Grayson's eyeglasses), a coat, and the money from Grayson's bureau was pursuant to validly given consent. One exception to the warrant and probable cause requirements of the Fourth Amendment is a search conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Welch v. United States*, 466 A.2d 829, 843 (D.C. 1983); *Jackson v. United States*, 404 A.2d 911, 920 (D.C.1979). The consent must be voluntary and the voluntariness is to be determined from the totality of the circumstances. *Schneckloth v. Bustamonte, supra*, 412 U.S. at 229, 93 S.Ct. at 2048; *Welch, supra*, 466 A.2d at 844. Permission for a search need not be given by the defendant but may also be obtained from a third party "who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *Frazier v. Cupp*, 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969).

The trial court found that Grayson's mother, as the lessee and person who exercised control over the entire apartment, had authority to consent to the search of Grayson's bedroom, and that her consent was voluntary and not the product of improper pressure. The record indicates that the trial court assessed the totality of the circumstances and evaluated the credibility of the witnesses, particularly Grayson's mother's demeanor. "Since determinations on the issue of consent are factual in nature, ... they may not be reversed unless they are clearly erroneous." *Welch, supra*, 466 A.2d at 844 (citations omitted). We hold the trial court's findings were supported by the evidence.

Appellant's claim that his mother's authority to consent to a search of the room did not extend to a search of the gym bag is without merit. Grayson did nothing to assert an exclusive right of control over the bag; it was unzipped and in an open area of the apartment to which all members of the household had access. *See United States v. Harrison*, 220 U.S.App. D.C. 124, 129, 679 F.2d 942, 947 (1982) (where boxes found in common area, not sealed or taped but closed by "crisscrossed" flaps, wife's consent to search of the boxes held valid); *Welch, supra*, 466 A.2d at 845 (wife had sufficient relationship to basement office to consent to search of unlocked desk). Since Grayson assumed the risk that his mother would permit someone to look in the bag, *Frazier v. Cupp, supra*, 394 U.S. at 740, 89 S.Ct. at 1425, we affirm the trial court's ruling that she had authority to consent to the search of the room and the bag.

### B.

Grayson bases his Fifth Amendment claim on his contention that statements obtained by Detective Green were in violation of *Miranda v. Arizona, supra* note 2, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, because Detective Green did not "scrupulously honor" his asserted rights to remain silent and not to answer questions without an attorney present. *Michigan v. Mosley, supra* note 3, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313.

1. *The Statements.* Under *Miranda, supra*, 384 U.S. at 473–74, 86 S.Ct. at 1627, "[o]nce warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." The issue before us is whether Detective Green's remarks to Grayson after he invoked his rights to remain silent and not to answer questions without an attorney present constituted "interrogation." In deciding this issue, we are guided by *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), which was decided while this appeal was pending. *See United States v. Alexander*, 428 A.2d

42 (D.C.), *reh'g denied,* 441 A.2d 936 (D.C. 1981).

■■■■ In *Innis, supra,* the Supreme Court defined interrogation under *Miranda* to refer "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." The *Innis* test of interrogation requires us to make an objective evaluation of the normally foreseeable effect of Detective Green's remarks, which turns on the objective purpose manifested by Green, and then to consider any peculiar susceptibilities of Grayson which were known to Detective Green when he spoke to him in the homicide office. *Innis, supra,* 446 U.S. at 301–02, 100 S.Ct. at 1689–90; *(Dalton) Hawkins v. United States,* 461 A.2d 1025, 1030 (D.C.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 734, 79 L.Ed.2d 193 (1984). The latter part of the *Innis* definition of interrogation focuses primarily on the perceptions of the subject in order to "reflect the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." *Innis, supra,* 446 U.S. at 301, 100 S.Ct. at 1690.[9] In *Miranda* the Court noted that coercion could occur without direct questioning, citing among examples, the use of a coached witness in a lineup that "was designed to establish that the defendant was in fact guilty as a predicate for future interrogation" and the use of psychological ploys "such as to posit the guilt of the subject." *See id.* (citing *Miranda, supra,* 384 U.S. at 450, 453, 86 S.Ct. at 1615, 1616). In *Innis,* the Court also noted that finding a defendant is subjected to "subtle compulsion" is not the end of the inquiry since it must also be established that a suspect's incriminating response was the product of words or actions by the police that they should have known were likely to elicit "any response whether inculpatory or exculpatory that the prosecution may seek to introduce at trial." *Innis, supra,* 446 U.S. at 300–01 & n. 5, 100 S.Ct. at 1689–90 & n. 5; *Brewster v. United States,* 271 A.2d 409, 412 (D.C.1970).

Detective Green testified that when he arrested Grayson he told the transporting Officer, Officer Lomax, "Don't talk to this man. Don't have any conversation with him. If he talks to you, tell him to be quiet. Just take him to my office. We'll be there as soon as we can." Other detectives at the scene told Lomax to read Grayson his *Miranda* rights; Lomax did, and he also called the homicide office to tell the detectives to advise Grayson of his rights when he arrived there. At the homicide office, Grayson was given a rights form (Form PD 47), which he read, marked and signed. On both occasions Grayson indicated that he did not want to answer any questions and did not want to answer questions without an attorney present.

When Detective Green arrived at the homicide office, he was informed that Grayson had asserted his rights to silence and to have an attorney present during any questioning. Green looked at the rights form which Grayson had executed and also spoke with the detectives who had advised Grayson of his rights. Green then went with his partner to the interview room where Grayson was and spoke to him for almost ten minutes. In summarizing his remarks, Detective Green testified:

**9.** By defining "interrogation" to include police activities other than direct questioning, *Innis* reaffirmed a basic *Miranda* principle. Thus *Innis* necessarily calls into question pre-*Innis* decisions which relied on the language in *Mosley* as suggesting a willingness to permit a greater degree of flexibility in applying the *Miranda* safeguards, depending on the factual circumstances. *See, e.g., United States v. Pheaster,* 544 F.2d 353, 364–65 (9th Cir.1976), *cert. denied,* 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977) and cases cited therein; *see also Fare v. Michael C.,* 442 U.S. 707, 718, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979) (rigidity of *Miranda* procedures justified). *See generally* White, *Interrogation Without Questions: Rhode Island v. Innis and United States v. Henry,* 78 Mich.L.Rev. 1209, 1233 (1980).

A. I explained to Mr. Grayson that I was the officer who had arrested him in the apartment. I explained to him that I knew he had been advised of his rights by the uniformed officer who brought him down here. I asked him to please not say anything to me, but to listen, at which time I told him that the officer that had advised him of his rights knew nothing about the investigation, he was simply a transporting police officer from the scene of the arrest to our office; and I told Mr. Grayson that—in fact, I had the rights card in my hand—that he had said no, that he didn't want to answer any questions. I explained to Mr. Grayson and explained—and told him that he was arrested for homicide, that we had a—what we felt to be a very strong case.

Q. Did you tell him anything about the case itself, where it had occurred or when, anything of that nature?

A. Not—not specifics, no sir.

I told him that we had in fact recovered a shotgun from his room, that we were given information by a citizen that not only was he directly involved in the homicide, but that he was fingered as the trigger man. I explained to him that if he wanted to tell me what happened, that he had an opportunity to do so; that the information we were given led us directly to him, to the shotgun, to the recovery of some money, and other items that we felt were evidence in the case; that it was unfortunate that the officer advised him of his rights prior to us getting there, that he knew nothing about the case; and I told him that if he wanted, in fact, now to tell me what happened, and tell me his involvement, if any, in the case, that he could do so.

Grayson did not say anything. Detective Green gave him another rights form and asked him to read it. Grayson then told Detective Green, before reading the new rights form, that he wanted to tell him what had happened. Detective Green testified:

I told him that I didn't want him to say anything to me, or to ask me any questions, or to tell me anything, until he read that form, and that if he wished, at that point, to waive his rights, that he could do so, and then we would have a conversation with one another.

I still had not asked him any questions. I told him that I wanted him to read this form, and if he did, in fact, want to talk to me, to answer the questions on the back side of the form.

Grayson read the rights form and answered all four questions "yes," indicating that he was waiving his previously asserted rights.[10] Grayson thereafter gave oral and written statements to the police.

The trial court denied the motion to suppress, finding Grayson's statements were voluntarily made under *Jackson v. United States*, 404 A.2d 911 (D.C. 1979), and that his waiver of his rights was a knowing and intelligent relinquishment of a known right. *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The trial court did not specifically address whether Grayson's asserted *Miranda* rights were "scrupulously honored" under *Mosley, supra* note 3, or whether he was "interrogated"; nor were its findings the functional equivalent of findings on those issues. We affirm the trial court's finding that Grayson had invoked his rights to remain silent and not say anything without an attorney present since it is supported by substantial evidence. D.C.Code § 17–305(a) (1981). However, under *(Joseph) Wilson v. United States*, 444 A.2d 25, 27–28 (D.C.1982), we can only affirm the trial court's determination that a defendant made a voluntary and intentional

---

10. Grayson received his first *Miranda* warnings from Officer Lomax at approximately 10:08 p.m. He received his second *Miranda* warnings between 10:15 and 10:30 p.m. Grayson waived his previously asserted rights to remain silent and to have counsel present during questioning at approximately 10:45 p.m. His oral statements to Detective Green lasted from that time until approximately 11:59 p.m. His written statement began after he received another *Miranda* warning and was completed at approximately 2:17 a.m.

relinquishment of a known right if the defendant's asserted *Miranda* rights were "scrupulously honored" under *Mosley.* Since the record before us is sufficient, we must therefore determine whether, as a matter of law, Grayson's rights were "scrupulously honored." *Hawkins, supra,* 461 A.2d at 1032; *Alexander, supra,* 428 A.2d at 49.

■ Objectively viewing Detective Green's remarks and actions, we hold that he should have known they were reasonably likely to cause Grayson to relinquish the rights he had asserted under *Miranda* and to elicit incriminating evidence.[11] Detective Green's remarks were not "a few offhand remarks," as in *Innis,* and there were no extenuating circumstances to suggest that Detective Green had any purpose in inducing Grayson to talk other than to pursue his investigation, as did the detective in *Alexander, supra,* 428 A.2d at 49. In view of the information the police had from Melson and the recovery of the shotgun and other evidence, this was not a case where a victim or innocent bystander was to be saved,[12] and the time for totally exculpatory explanations had passed;[13] nor was this a situation which can fairly be characterized as responding to the defend-

ant's need for consolation.[14] Detective Green was an experienced detective and was familiar with *Miranda* procedures.[15] When he spoke to Grayson, he was not engaged in routine booking and arrest procedures, as in *Hawkins, supra,* 461 A.2d 1025. Rather, his remarks went to the heart of the offense under investigation, relating details about the strong case the police thought they had. *Wilson, supra,* 444 A.2d at 27–28; *see Miley v. United States,* 477 A.2d 720 (D.C.1984). Moreover, his remarks were made after Grayson's earlier invocation of his right to counsel had "acknowledged his position vis-a-vis the police was one of weakness," *Mosley, supra,* 423 U.S. at 110 n. 2, 96 S.Ct. at 329 n. 2, (White, J., concurring), and when the proper way to communicate was through Grayson's lawyer, or by waiting until a lawyer was present. *Miranda, supra,* 384 U.S. at 474, 86 S.Ct. at 1627.[16]

The record does not indicate Grayson suffered from any peculiar susceptibilities when Detective Green spoke to him. Grayson was not distraught (the killing had occurred the day before his arrest and involved a stranger, unlike *Alexander*), nor impaired mentally by alcohol or drugs.

---

**11.** *See In re Durand,* 206 Neb. 415, 293 N.W.2d 383 (1980) (showing accused police reports of other crimes was "interrogation" within meaning of *Miranda;* police conduct held "functional equivalent" of questioning because it implied the threat of other prosecutions for other crimes).

**12.** *New York v. Quarles,* —— U.S. ——, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). *See People v. Modesto,* 62 Cal.2d 436, 446–47, 398 P.2d 753, 759, 42 Cal.Rptr. 417, 423 (1965); *People v. Dean,* 39 Cal.App.3d 875, 885, 114 Cal.Rptr. 555, 560–61 (1974). *See also Pheaster, supra,* 544 F.2d at 368 n. 9.

**13.** *White v. United States,* 222 A.2d 843, 845 (D.C.1966).

**14.** *State v. Jones,* 386 So.2d 1363, 1367 (La.1980) (defendant killed his infant son, police offered words of consolation after which defendant made a statement).

**15.** Detective Green was an eleven year veteran of the police department and had been in the homicide branch for nine years. He testified it

was his practice to stop questioning a suspect about a case (as distinct from routine booking questioning) when the suspect asserted his *Miranda* rights. On many occasions, Green testified, a suspect would come back and say, "I'll talk to you," and then Green would ask him why he wanted to talk, and would readvise the suspect of his rights.

**16.** Before a valid waiver of an asserted right to counsel can be shown, "[t]he record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." *Miranda, supra,* 384 U.S. at 475, 86 S.Ct. at 1628 (quoting *Carnley v. Cochran,* 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962)); *Walker v. United States,* 250 A.2d 553 (D.C.1969). Grayson's mother testified she did not hear from her son until about 2:30–3:00 a.m., after he had given his written statement to the police. Grayson and his mother then decided she should get in touch with his lawyer as soon as she could.

Nor was he naive, like the defendant in *Alexander;* Grayson was 19 years old and had a prior felony conviction.[17] However, Detective Green admitted that when he arrived at the homicide office Grayson was "afraid" because he was unaware of why he had been arrested. Green also admitted that his remarks were intended "to let [Grayson] know that we knew he was the trigger man in this case, and there were a lot of things that we did not know, and I would like very much for him to tell me if he so desired."

We hold Detective Green's remarks were designed to elicit an incriminating response in the face of Grayson's assertion of his rights to silence and counsel and constituted the "functional equivalent" of interrogation. *Innis, supra,* 446 U.S. at 301, 100 S.Ct. at 1689. Furthermore, upon examining the factors in *Mosley, supra,*[18] to determine ultimately whether Grayson's Fifth Amendment rights were violated, *Wilson, supra,* 444 A.2d at 29, we conclude that Detective Green's action did not comport with the guidelines as set forth in *Mosley.* The transporting officer testified he did not ask Grayson any questions, not even whether Grayson understood the *Miranda* rights of which he had been advised;

the fifteen minute interval between Grayson's reassertion of his rights and Green's remarks is not the significant type of break described in *Mosley;* nor did Detective Green begin his remarks by first giving Grayson new *Miranda* warnings. Accordingly, we hold that Grayson was provided insufficient *Mosley* safeguards to assure that his rights were "scrupulously honored." *Wilson, supra,* 444 A.2d at 29; *Peoples v. United States,* 395 A.2d 41 (D.C. 1978), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2826, 61 L.Ed.2d 277 (1979). Therefore, we conclude his statements were not the result of an intentional relinquishment or abandonment of a known right or privilege for purposes of his Fifth Amendment protection required by *Miranda,*[19] and should have been suppressed. *Mosley, supra,* 423 U.S. at 100, 96 S.Ct. at 324 (procedures established by *Miranda* must be followed or "any statements given by the person in custody cannot be admitted over his objection in evidence against him as a defendant at trial, even though the statement may in fact be wholly voluntary"); *Wilson, supra,* 444 A.2d at 30; *Alexander, supra,* 428 A.2d at 52.[20]

2. *The Fruits.* Grayson also seeks to suppress the tangible "fruits" of

---

17. Grayson had waived his *Miranda* rights in connection with prior charges according to the prosecutor and Detective Green. The record is unclear about precisely what Detective Green knew when he made his remarks to Grayson, however.

18. As summarized in *Alexander, supra,* 428 A.2d at 49, the *Mosley* court relied on the following factors:

(1) [B]efore the first questioning of the defendant, he was carefully advised of his *Miranda* rights, which he orally acknowledged; (2) the police immediately ceased questioning defendant when he indicated he wanted to stop and made no attempt to resume questioning or ask him to reconsider; (3) there was a two-hour break between the first interrogation and the second, performed at a different location by a different officer, about a different crime; and (4) a full and complete set of *Miranda* warnings were given before the second questioning began, including a full and fair opportunity for the defendant to examine

his options; (5) finally, the subsequent questioning did not undercut the defendant's previous decision to remain silent because it involved an unrelated offense.

19. We do not reach the issue of whether Grayson waived his rights. *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979).

20. Since Grayson's written statement was prepared by Detective Green immediately after, and on the basis of Grayson's oral answers to Detective Green's questions, there is no basis upon which the trial court could have found that the original taint was sufficiently dissipated. *See Boykins v. United States,* 366 A.2d 133, 136 (D.C.1976) (taint of first illegally obtained statement sufficiently dissipated); *Ruffin v. United States,* 293 A.2d 477, 480 (D.C.1972) (remanded for determination of whether second statement was produced directly by earlier statement); *United States v. Hackley,* 204 U.S.App. D.C. 221, 230, 636 F.2d 493, 502 (1980) (second statement need not be excluded).

the violation of his *Miranda* rights. The government contends that the exclusionary rule does not apply to the "fruits" of a *Miranda* violation. However, we need not decide this issue because all of the evidence Grayson seeks to have excluded was either in "plain view," *Coolidge v. New Hampshire*, 403 U.S. 443, 468–69, 91 S.Ct. 2022, 2039–40, 29 L.Ed.2d 564 (1971), or arrived at by an independent source.[21] *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920). Grayson's coat had been described by a bystander who saw three men fleeing in an alley behind the garage on the night of the crimes, and was in plain view when Grayson, wearing the coat, was taken to the homicide office following his arrest. The blister injury to his hand would have been observed by any of the officers who conducted the "booking" process, especially in the course of taking fingerprints, *see Nix v. Williams*, —— U.S. ——, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). As previously discussed, *supra* Part II A, the shotgun, gym bag, eyeglasses, and money were seized pursuant to a valid consent search. With respect to Wright's testimony, the record indicates that Wright was located through information provided to Detective Green by Holland; Grayson did not name Holland in his statement, and Melson had

told the police during their initial meeting about the others involved in planning the robbery. Finally, the trial court's finding that Wright voluntarily gave the police the attache case, paper bag and robbery money is supported by evidence in the record.

3. *Harmless Error.* This court has held that the admission of a statement obtained in violation of *Miranda* is subject to the harmless constitutional error standard of *Chapman v. California, supra* note 4, 386 U.S. at 24, 87 S.Ct. at 828. *Lewis v. United States*, 483 A.2d 1125, 1130 (D.C. 1984) (*Chapman* standard applicable where statement is voluntary); *see also Milton v. Wainwright*, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (harmless beyond a reasonable doubt to admit statements deliberately elicited after Sixth Amendment right to counsel had attached); *Miley, supra*, 477 A.2d at 724 (improper admission of statements obtained during custodial interrogation harmless beyond reasonable doubt).[22] Grayson does not contend, and the record does not suggest, that his statement was involuntary because compelled by police threats or promises or "third degree" tactics. Rather, the coercion of which he complains relates to the conditions which we hold constituted the functional equivalent

---

**21.** *See Michigan v. Tucker*, 417 U.S. 433, 450–51, 94 S.Ct. 2357, 2367, 41 L.Ed.2d 182 (1974) (when there has been a violation of the procedural, prophylactic rules of *Miranda*, a balancing test must be employed to determine whether the "fruits of the illegally obtained confession must be suppressed). In *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), the Supreme Court held that a confession induced by the introduction into evidence of prior confessions obtained in violation of the Fifth Amendment must be suppressed. However, the Supreme Court has not specifically decided whether indirect tangible or third party testimonial evidence discovered as a result of a Fifth Amendment violation must be excluded. *See United States v. Downing*, 665 F.2d 404, 409 (1st Cir.1981). Several courts have excluded such evidence. *See, e.g., Downing, supra* (defendant asserted right to counsel, police officer nevertheless interrogated him and learned location of defendant's airplane; held, evidence discovered in plane inadmissible); *Commonwealth v. White*, 374 Mass. 132, 371 N.E.2d 777 (1977)

(statement excluded because defendant had not waived his rights and statement could not serve as probable cause for search warrant for defendant's automobile; held, evidence from car must be suppressed), *aff'd by an equally divided court*, 439 U.S. 280, 99 S.Ct. 712, 58 L.Ed.2d 519 (1978). The Supreme Court has stated that "the exclusionary sanction applies to any 'fruits' of a constitutional violation." *United States v. Crews*, 445 U.S. 463, 470, 100 S.Ct. 1244, 1249, 63 L.Ed.2d 537 (1980). *But see New York v. Quarles, supra* note 12, —— U.S. at ——, 104 S.Ct. at 2641 (O'Connor, J., concurring and dissenting) (although statement obtained in violation of *Miranda*, evidence discovered from statement should be admissible).

**22.** *See also United States v. Morris*, 700 F.2d 427, 431 (1st Cir.), *cert. denied*, 461 U.S. 947, 103 S.Ct. 2128, 77 L.Ed.2d 1306 (1983); *United States v. Ferreboeuf*, 632 F.2d 832, 834 (9th Cir. 1980), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 368 (1981).

of interrogation. Even were we to hold that, therefore, Grayson could not have knowingly and intelligently waived his Fifth and Sixth Amendment rights, (*Joseph*) *Wilson, supra*, 444 A.2d at 27–28, we would hold that the interrogation in this case "involved no compulsion sufficient to breach the right against compulsory self-incrimination" and his statement was "voluntary" for purposes of the harmless error analysis. *See Michigan v. Tucker, supra* note 21, 417 U.S. at 445, 94 S.Ct. at 2364;[23] *Lewis, supra* at 1131 n. 7 (dictum).[24] Thus we must determine "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Chapman v. California, supra* note 4, 386 U.S. at 23, 87 S.Ct. at 827 (quoting *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–231, 11 L.Ed.2d 171 (1963)).

 As this court commented in *Brooks, supra*, 367 A.2d at 1309–10, the harmless error analysis "should not be limited to superficial inquiry as to whether the

same verdict would have been possible absent the tainted evidence," but must also consider its "probable impact on the minds of an average jury" (quoting *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969)).[25] Following the analysis of *Lewis, supra*, we first examine the substance of Grayson's admissions to Holland, Melson and Wright, and the other evidence adduced by the government which tended to establish the same facts admitted by Grayson in his admissions to them, and then consider the effect on the jury of Detective Green's testimony about Grayson's confession.

Holland testified he met the appellants in Derrington's apartment on the Sunday before the Metheny robberies to plan the liquor store robbery. Derrington had told them it would involve a white man in a liquor store in Northwest who carried the store receipts in a suitcase. The man had a .38 gun, and all the robbers would carry guns; Derrington was to have a .25 automatic gun with him and Grayson would

**23.** *In Michigan v. Tucker, supra* note 21, 417 U.S. at 443, 94 S.Ct. at 2363, the court noted:

Thus the Court in *Miranda*, for the first time, expressly declared that the Self-Incrimination Clause was applicable to state interrogations at a police station, and that a defendant's statements might be excluded at trial despite their voluntary character under traditional principles.

**24.** The record does not suggest the circumstances surrounding Grayson's statement, *see supra* Part II B, were similar to those in *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978) (four hours of questioning of "seriously and painfully wounded man on the edge of consciousness") and *New Jersey v. Portash*, 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979) (testimony introduced to impeach obtained in response to a grant of legislative immunity), cited in *Lewis, supra*, 483 A.2d at 1131 & n. 7.

**25.** *See generally* Field, *Assessing the Harmlessness of Federal Constitutional Error: A Process in Need of a Rationale*, 125 U.Pa.L.Rev. 15, 16, 41–55 (1976). The author discusses the three possibilities for demonstrating harmless error found in Supreme Court cases: one focuses upon the erroneously admitted evidence and asks whether it might have contributed to a

guilty verdict; a second asks whether, once erroneously admitted evidence is excluded, there remains overwhelming evidence to support the jury's verdict; and a third asks whether the tainted evidence is merely cumulative—that is, merely duplicative of some remaining admissible evidence. The author suggests, recognizing no test will fit all of the circumstances, where harmlessness is appropriate, that the proper test focuses on the persuasiveness of the erroneously admitted evidence, in conjunction with a narrow cumulative evidence test: "constitutional error should be declared harmless only when error itself is either irrelevant or trivial, or when other independent, substantially similar evidence indisputably proved the proposition to which the tainted evidence was relevant." *Id.* at 60. She further argues that "violations of per se rules that the Supreme Court has established should result in automatic reversal if application of the harmless error standard would essentially alter the constitutional rule itself. * * The issue concerning a confession obtained in violation of *Miranda* must be whether the *admission* of the confession was harmless—*i.e.*, whether it had no effect—and *not* whether it was harmless to obtain it illegally." *Id.* at 21 n. 19 (citing *People v. Schader*, 62 Cal.2d 716, 729–31, 401 P.2d 665, 673–74, 44 Cal.Rptr. 193, 201–02 (1965); *Ibsen v. State*, 83 Nev. 42, 422 P.2d 543 (1967)). (Emphasis in original.)

have his shotgun. Holland claimed he had decided later not to join them after talking to his girlfriend who said it was not worth it. The day after the robbery, Grayson telephoned Holland and told him about the robbery, including that he had shot a white man in the face and taken a bag containing money from the lady who was with the man. Grayson said he had shot the man because the man had a .38 pistol, and because "Andre's" gun had jammed. Holland also testified he had previously seen Grayson's sawed-off shotgun.

Melson's testimony was similar. Melson had also heard appellants talking about robbing a white man who owned a liquor store downtown. He testified Derrington had instructed Grayson to shoot the man when they went in. Melson told Grayson he did not want to join them. The morning after the Metheny robberies Grayson had come to Melson's home and showed him a lot of money from the robbery. Grayson told Melson he had shot the man, who was in a basement, because after the man had assisted a lady into the car, he appeared to reach for something. Melson, too, had previously seen Grayson's shotgun.

Wright testified that Derrington had been staying at his apartment for several days. Grayson had come over with others on the afternoon of the robbery, and appellants and two others had left early in the evening. When the four men returned to Wright's apartment later that evening, Wright noticed they had an attache case and Grayson had a shotgun. Wright heard Grayson say something about "popping someone in the eye." The four men went into a bedroom to divide the money, and when Derrington was about to throw away the attache case, Wright asked if he could have it and Derrington gave it to him. The next day Wright gave the case to Detective Green, who also found a paper bag in the bedroom.

Other testimony corroborated the testimony about Grayson's admissions. Although Mrs. Metheny could not identify any of the perpetrators, including Grayson, in a lineup, she described the shooting that occurred after her husband had assisted her and put his attache case in the car, including how a gun had jammed and the gunman had taken her purse and the attache case. An employee at the liquor store testified he thought appellants had previously been in the store, and described Mr. Metheny's practice of putting the store receipts in a paper bag which he then put in his attache case. A bystander saw three men running in an alley behind the garage at the time of the robbery; one man had on a trenchcoat and appeared to be hiding something underneath it.

The physical evidence recovered by the police included the victim's attache case and Grayson's shotgun. Mrs. Metheny identified her husband's attache case, which was the same one Wright had given to Detective Green, and a paper bag as similar to the kind her husband used for the store's receipts. She also identified Grayson's eyeglasses as like those the gunman was wearing, and his shotgun as looking like the murder weapon. Holland and Melson also identified Grayson's shotgun. In addition, a firearms identification expert testified that the shotgun casing found at the scene of the shooting had been fired from Grayson's shotgun. The wounds suffered by Mr. Metheny were also consistent with the spray of pellets which occurred when Grayson's shotgun was fired.[26] A police firearms expert testified the blister on Grayson's hand could have been caused by firing the shotgun with the index finger. The coat seized from Grayson was similar to that described by the bystander who saw three men running down an alley near the garage.

Detective Green testified that Grayson had admitted driving to the garage with

---

**26.** The firearms identification expert described the spray of pellets when Grayson's shotgun was fired. The deputy medical examiner's testimony also described the spray: Mr. Metheny had been struck by four different missiles or buckshots, in the right forehead, beneath the right cheek, across the top of the head and in the left eye.

three other men, whom he claimed not to know, to rob a white man. The man had assisted his wife into a car in an underground garage, and as he was walking to the other side, Grayson admitted he fired at him. Grayson claimed, however, that as he was "fumbling" with the gun which was inside his coat, it accidentally went off. He also claimed he had gone over to the car to see if the lady was all right and somehow had taken the attache case. He said the shotgun had caused a blister on his hand, and identified his eyeglasses and the coat he had worn during the robbery, as well as the money from his bureau, as proceeds of the robbery.

Based on Grayson's admissions to Holland and Melson, which Grayson does not seek to suppress and were properly admitted in evidence against him,[27] and the corroborative testimonial and physical evidence, we are satisfied that Detective Green's tainted testimony about Grayson's confession could not have affected the verdict. We have reached this conclusion only after examining four aspects of the trial relating to the impact of the tainted testimony: first, its probative value as compared to the untainted evidence; second, the extent to which the untainted evidence was disputed; third, the effect of the tainted evidence on Grayson's presentation of a defense; and fourth, the effect of inadmissible hearsay and opinion testimony.

A jury is likely to give greater weight to a homicide detective's testimony about a defendant's voluntary confession than to the testimony of a defendant's friends and accomplices about his admissions. Thus, the latter testimony could be accepted primarily as reinforcing the former. Indeed, this is how the prosecutor described the case in his opening statement

to the jury. *Cf. Commonwealth v. Pearson,* 427 Pa. 45, 233 A.2d 552 (1967) (where government emphasizes tainted evidence, error less likely to be harmless). However, as the trial developed, the testimony of Holland, Melson and Wright, as supported by the physical evidence, presented the jury with consistent testimony about all elements of the crimes necessary to convict Grayson. By the time Detective Green testified about Grayson's confession, his testimony was cumulative in all significant respects,[28] and this was how the prosecutor presented the case to the jury in his closing argument. Because of redaction problems, Green's testimony about Grayson's confession was relatively limited in comparison to Holland's and Melson's. Furthermore, the probative value of their testimony about Grayson's admissions was somewhat enhanced because his admissions had preceded police involvement in the case and were related to Detective Green before the witnesses could confer among themselves.

Moreover, even absent the cumulative nature of most of Green's tainted testimony, we are also satisfied that the untainted evidence was compelling even though disputed by the defense through cross-examination and in closing argument. *See* Field, *supra* note 25, at 44. By cross-examination and in argument to the jury, defense counsel suggested that Holland, Melson and Wright might have been involved in the crimes. Yet, despite vigorous cross-examination, the witnesses did not change their stories, which remained mutually corroborative and was corroborated by the physical evidence. Each witness continued to deny he was involved in the crimes for which appellants were on trial or that he had any personal advantage to

---

**27.** *Powell v. United States,* 414 A.2d 530, 533 (D.C.1980) (per curiam) (admissions of a party inconsistent with his position in the litigation may be introduced as an admission, *Johns v. Cottom,* 284 A.2d 50, 52 (D.C.1971), and such admissions come in as substantive evidence of the facts admitted (citations omitted.)

**28.** The only tainted evidence the jury heard from Detective Green which it did not hear from other witnesses was Grayson's explanation that the shooting was an accident and his admissions identifying certain physical evidence as his (the eyeglasses and coat and the robbery money). Green also emphasized, on redirect, the voluntariness of Grayson's confession.

gain; Detective Green testified that no promises had been made to any of the government's witnesses. Further, some of the impact of the defense attacks was diffused by the government's direct examination which explored the issue of the witness' motives for testifying.[29]

■ We also conclude that Detective Green's tainted testimony was only one of several factors limiting Grayson's defense. *See Fahy v. Connecticut, supra,* 375 U.S. at 90–91, 84 S.Ct. at 232–233; *United States v. Baldwin,* 691 F.2d 718, 724 (5th Cir.1982) (harmless error where overwhelming evidence of guilt and no claim tainted confession exerted adverse impact on conduct of defense and record failed to disclose such impact); *Brooks, supra,* 367 A.2d at 1310. Admittedly, the inconsistencies between Grayson's admissions to Holland and Melson and his confession to Green were sufficient to highlight the implausibility of his explanation to Green that the shooting had been an accident. But even without Green's tainted testimony, Grayson's admissions to the other witnesses and the physical evidence recovered by the police limited the defense he could present. Holland and Melson also testified that Grayson had not indicated on the day after the robbery that the shooting was accidental.

■ We recognize, however, Detective Green's testimony was also designed to allay jury skepticism about Melson's and Holland's testimony. Green testified after Holland, Melson and Wright, and in the course of reviewing his investigation he summarized what they had told him, and on redirect examination he vouched for Melson's truthfulness and Holland's lack of involvement in the homicide. Much of this testimony was inadmissible hearsay and opinion testimony,[30] but it was also independent of his tainted testimony, and in the absence of defense objection, the trial court was not under a duty to strike it *sua sponte. Id.* In addition, Green could properly testify about the circumstances under which he had spoken to Holland, Melson and Wright, and about Holland's arrest and the dismissal of the charges. Thus, the prosecutor had evidence on which he could properly base his closing argument that Melson, Holland and Wright did not stand to gain personally by testifying against appellants. The court instructed the jury that it should receive the testimony of the accomplice Holland with caution, and could not convict Grayson unless his confession was corroborated or there was independent evidence of his guilt. Neither the note from the jury requesting, after two hours' deliberation, a clearer instruction on the meaning of premeditated murder, nor the length of the jury's deliberations suggests to us the verdict was a compromise or that the jury thought the case was "close."

**29.** The jury heard Holland testify on direct examination that he had been arrested along with appellants but the charges against him had been dropped. Melson testified on direct examination that he had only spoken to the police after his father had contacted them without his knowledge, and was on probation for a felony conviction of armed robbery and carrying a pistol; on cross-examination he testified he only came forward because he thought the killing was wrong. Wright, on direct examination, admitted his apartment had been the meeting place before and after the robbery, and that Derrington had given *him some of the robbery* money in payment, Wright claimed, for a prior debt, as well as the victim's attache case.

**30.** *See infra* Part III B. This included his testimony repeating what Melson, Holland and Wright had told him about Grayson's admis-

sions. *See Williams, L. Johnson & William Johnson v. United States,* 483 A.2d 292, 296 (D.C. 1984) (prior consistent statements made to police at time witnesses under arrest and knew they could be tried for first-degree murder, and hence had motive to lie). Green's opinion testimony on redirect—"I had faith in the young man [Melson]," "I believe in what he [Melson] had to tell me" and that he had no reason to suspect Melson was involved in the robbery and murder, and "we felt there was simply no direct involvement on [Holland's] part in this homicide"—was also improper because the credibility of witnesses is for the trier of fact. *Morrison v. United States,* 417 A.2d 409, 413 (D.C.1980); *see Carter v. United States,* 475 A.2d 1118, 1126 (D.C.1984) (one witness may not express an opinion on the ultimate credibility of another).

Accordingly, as "virtually everything in [Detective Green's testimony about Grayson's confession] was otherwise presented to the jury . . .," *Lewis, supra,* 483 A.2d at 1131, and upon analysis of its impact, we hold the tainted testimony was harmless beyond a reasonable doubt.

### III. Appellant Derrington

### A. *Unanimous Verdict*

Derrington contends that his conviction must be reversed because there was a possibility that the jurors were not unanimous in their findings and the trial court's instructions did not clearly identify for the jury that its verdict must be unanimous. No objection was made to the instructions at trial; Derrington must therefore demonstrate that the error complained of was "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc). We hold he has failed to do so.

The government sought to convict Derrington on a theory of aiding and abetting. The trial court instructed the jury on aiding and abetting, and specifically that the jury must find either that Derrington was present at the scene of the crime or he was guilty as an aider and abettor, and that the verdict must be unanimous. Derrington contends that because some jurors might have found beyond a reasonable doubt that he was present at the scene of the offense while others might have believed his alibi defense but concluded beyond a reasonable doubt that he planned the robbery and shared in its proceeds, the trial court's instructions were erroneous.

Within the meaning of the Sixth Amendment [31] to the United States Constitution and Super.Ct.Crim.R. 31(a),[32] the unanimity rule "requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether that defendant is guilty of the crimes charged." *Johnson v. United States,* 398 A.2d 354, 369 (D.C.1979) (quoting *United States v. Gipson,* 553 F.2d 453, 457–58 (5th Cir.1977)); *quoted in Burrell v. United States,* 455 A.2d 1373, 1379 (D.C.1983), and *Hack v. United States,* 445 A.2d 634, 641 (D.C.1982). But as these cases make clear, the danger of a non-unanimous verdict arises where one charge in the indictment encompasses two separate incidents. *Burrell, supra,* 455 A.2d at 1379–80 (no non-unanimous jury problem when only one murder charged but differing accounts as to how it occurred); *Hack, supra,* 445 A.2d at 641 (unanimous verdict possible when two separate samples of marijuana introduced but only one count of possession of marijuana charged); *(Charles) Hawkins v. United States,* 434 A.2d 446, 449 (D.C.1981) (non-unanimous verdict possible where two separate incidents of assault charged in one count and trial court gave ambiguous instructions). One charge encompasses two separate incidents when each incident constitutes an act which is conceptually severable and chargeable as a separate offense. *Barkley v. United States,* 455 A.2d 412, 415 (D.C. 1983). Thus, in *Johnson, supra,* 398 A.2d at 369–70, where the defendant was charged with assault with intent to kill by throwing the victim either out of a window or into the river at a later time, it was held reversible error to instruct the jury that it could convict by finding the defendant had done either. However, where there is a single incident charged in the indictment and it is unnecessary for the jury to reconstruct the fatal events step-by-step, we may presume the unanimity requirement was satisfied. *Burrell, supra,* 455 A.2d at 1380; *see Gordon v. United States,* 466 A.2d 1226, 1234 (D.C.1983) (single indict-

---

**31.** The Sixth Amendment provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and impartial trial, by an impartial jury . . . ."

**32.** Super.Ct.Crim.R. 31(a) provides:
RETURN. The verdict shall be unanimous. It shall be returned by the jury to the judge in open court.

ment of armed robbery where defendant had a pistol and/or a knife).[33]

In the instant case, there was only one occasion on which the robberies and the murder occurred, and not two separately chargeable incidents which would normally raise the problem of lack of unanimity. The government's evidence and closing argument focused on the fact that the robbery was Derrington's idea—he planned it, enlisted two others and tried to enlist Holland and Melson, participated in dividing, and received some of, the robbery proceeds—and that there was more than one person in the garage at the time of the murder. Derrington's alibi defense only contested the government's evidence which suggested he was in the garage at the time of the murder; in closing argument his counsel contended the government had to prove he was in the garage at that time. In rebuttal argument, the prosecutor protested that it was unnecessary for the government to prove Derrington was in the garage since it only claimed he had aided and abetted in the commission of the offense and thus, even if the jury believed his alibi, it would still have to find him guilty if it believed he planned, enlisted, and received the robbery proceeds. Counsel for Derrington did not object to this analysis by the prosecutor in his closing argument.

▇▇▇ The trial court instructed that the jury could find Derrington guilty without finding he personally committed each of the acts constituting the offense or that he was personally present at the commission of the offense. When it reinstructed the jury on premeditated murder, the court further reminded the jury that the government was proceeding as to Derrington on a theory of aiding and abetting. Although invited to do so, Derrington's counsel did not request additional instructions during the discussion of proposed instructions nor after the general instructions to the jury nor after reinstruction. Thus, the jury was instructed by the court (and told by the prosecutor) that Derrington's guilt did not depend on proof he was in the garage. Accordingly, we conclude there was no plain error in failing to instruct the jury that it must agree on the precise facts of how Derrington aided and abetted in the commission of the crimes.

### B. Hearsay

Derrington contends that a substantial number of hearsay statements were improperly admitted at trial and that the individual and cumulative effect of those statements deprived him of a fair trial. He concedes that some of the statements were admissible against his codefendant as admissions of a party opponent, but argues that because they allegedly implicated him as well, they should have been excluded altogether, or the parts omitted which implicated him, or his motion for a severance should have been granted. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Carpenter v. United States*, 430 A.2d 496 (D.C.) (en banc), *cert. denied*, 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 143 (1981). He further argues that the testimony of several witnesses about admissions by Grayson that did not implicate him were prejudicial nevertheless. Finally, he claims that Detective Green, in recapitulating for the jury what several witnesses had told him during his investigation, included numerous inadmissible hearsay statements that were prejudicial and require reversal. We find no reversible error and comment only on two errors.

▇▇▇ During cross-examination of Holland, Grayson's attorney asked several

33. See *Martin v. United States*, 435 A.2d 395, 397 (D.C.1981) (court approves conjunctive pleading of a statute proscribing several acts, any one of which can be the basis of a proper conviction). *United States v. UCO Oil Co.*, 546 F.2d 833, 838 (9th Cir.1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977) (where statute defines a single offense, it is proper to charge the different means, set forth disjunctively in statute, conjunctively in each count of indictment, and it is not a valid objection that jury, in arriving at a unanimous verdict, may not agree on the particular means by which the offense was committed), quoted with approval in *Johnson, supra*, 398 A.2d at 369.

questions about Grayson's alleged admissions to Holland on the day after the crimes. Derrington contends that Grayson's alleged statement, "Andre's gun had jammed," was inadmissible hearsay as to him and directly implicated him as being present at the scene of the offense. Since there was evidence Grayson had his own gun, we agree that the inference from this statement was that Derrington accompanied Grayson and participated in the crime, and since Grayson did not testify, Derrington was deprived of his right to cross-examine the out-of-court declarant. However, this statement was not the type of unreliable but "powerfully incriminating" hearsay statement contemplated by the Supreme Court in *Bruton, supra,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. *Brabham v. United States,* 326 A.2d 254, 257 (D.C.1974), *cert. denied,* 421 U.S. 989, 95 S.Ct. 1993, 44 L.Ed.2d 479 (1975). It was sufficiently reliable because it was made "in casual conversation, out of the presence of police and ... [shortly] after the crime." *United States v. Bolden,* 169 U.S.App.D.C. 60, 70, 514 F.2d 1301, 1311 (1975). There was also independent evidence of guilt. *Brabham, supra,* 326 A.2d at 257. Therefore, although the trial court erred in overruling Derrington's objection,[34] we hold that the error does not require reversal.

Portions of Detective Green's testimony repeating what several witnesses had told him were clearly hearsay and inadmissible under any exception to the rule against hearsay. They were also prior consistent statements of government witnesses which could not have been introduced because the witnesses had not been impeached with other portions of the statements or by a charge of recent fabrication. *Reed v. United States,* 452 A.2d 1173 (D.C. 1982), *cert. denied,* — U.S. —, 104 S.Ct.

132, 78 L.Ed.2d 127 (1983); *United States,* 135 U.S.App.D.C. 295, 304, 418 F.2d 1131, 1140 (1969). Derrington therefore contends the trial court had an obligation *sua sponte* to strike the statements and instruct the jury to disregard them. Since no objection was made by defense counsel during the testimony, Derrington must now show that the admission of the statements constituted plain error. *See (Larry) Wilson v. United States,* 357 A.2d 861, 864 (D.C.1976) (hearsay testimony admitted without objection may be accorded same weight as other testimony).[35]

The trial court sua sponte called counsel's attention to the hearsay and advised that if either had any special jury instruction with regard to those statements, the court would allow counsel time to draft such instructions. After a recess, the only objection was a motion for a mistrial, based on Detective Green's testimony that he had not related everything in Grayson's statement; no motion to strike the testimony was made nor were any limiting or special instructions requested. All of the witnesses whose statements Detective Green repeated during his testimony had already testified and been subjected to cross-examination by Derrington's counsel. Therefore, we hold Derrington has failed to meet his burden to show that these statements were so prejudicial as to constitute plain error. *Bruton, supra,* 391 U.S. at 135, 88 S.Ct. at 1627. *See Carpenter, supra,* 430 A.2d at 506.

## C. *Other Crimes*

Derrington also claims "other crimes" evidence was improperly admitted contrary to *Drew v. United States,* 118 U.S.App. D.C. 11, 16, 331 F.2d 85, 90 (1964). We

---

**34.** The government contends that Derrington's counsel's objection to "this line of questioning, especially the last question" did not preserve the objection to the question and answer about the gun jamming. However, since the court overruled the objection without further comment, we are not prepared to conclude that counsel was limiting his objection only to the last ques-

tion. Thus, we are not reviewing the error for "plain error."

**35.** BINDER, HEARSAY HANDBOOK, 64 (2d ed. 1983) (failure timely to object to hearsay waives the objection) (citing *United States v. Jamerson,* 549 F.2d 1263, 1266–67 (9th Cir.1977)).

disagree. Holland testified that when he first met Derrington, they had discussed the idea of two other robberies. The trial court instructed the jury that the evidence was admitted only to show the surrounding circumstances of the charged crimes and the jury could only infer Derrington's guilt of robbery from the evidence relating to the robberies of Mr. and Mrs. Metheny. Derrington also objects to Holland's testimony that five days before the Metheny crimes, Derrington tried to get Holland to participate in a theft of Derrington's roommate's (Wright's) apartment; no limiting instruction was given regarding this evidence. He claims this evidence was unnecessary to an understanding of any material issue in the trial, not integrally related to the charges, did not occur immediately before, during or after the charged incidents, and was prejudicial because it suggested his propensity to commit the types of crimes with which he was charged; he relies on *Green v. United States*, 440 A.2d 1005, 1007 (D.C.1982). The government contends that the evidence was properly admitted under *Toliver v. United States*, 468 A.2d 958 (D.C.1983), and *Green, supra*, 440 A.2d at 1007.

▮▮▮▮ Evidence of a defendant's prior wrongful conduct which is admitted to complete the story of the crime on trial, *Toliver, supra*, 468 A.2d at 960 (quoting McCormick on Evidence § 190 (2d ed. 1972)), or to explain the immediate circumstances surrounding the offense charged, *Green, supra*, 440 A.2d at 1005, and is probative of other relevant issues, is admissible without regard to *Drew*. The determination of the relevance of such evidence, and whether its probative value outweighs its prejudicial

effect, is committed to the discretion of the trial court. *Willcher v. United States*, 408 A.2d 67, 75 (D.C.1979). This court will reverse only where that discretion has been abused, and we find no such abuse here.

▮▮▮▮ The analysis in *Tabron v. United States*, 410 A.2d 209 (D.C.1979), is instructive here. In *Tabron*, the defendant objected to the admission of evidence that he had helped plan two robberies and was present when one of his associates test fired a gun. This court upheld the trial court's finding that the evidence was relevant to premeditation or intent, to the weapons charges, and to explain the events leading up to the murder. While the court found the evidence of the planned robbery had "marginal relevance," it concluded the evidence did not have a significant effect on the jury's decision since the evidence was "merely cumulative" and any error harmless. *Id.* Here too, the evidence of the two planned robberies was relevant to explain Derrington's intent and the event leading up to and the setting of the murder and robbery; the evidence of the plan to rob his roommate, while less relevant, was cumulative, and we are satisfied that the error, if any, was harmless. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

### D. *Motion for New Trial or, Alternatively, to Vacate Judgment.*

Derrington filed a motion for a new trial on the basis of newly discovered evidence, Super.Ct.Crim.R. 33,[36] or, alternatively, to vacate sentence. D.C.Code § 23–110(a) (1981).[37] He alleged that the government had not disclosed an agreement with Mel-

---

**36.** Super.Ct.Crim.R. 33 provides in pertinent part:

The Court on motion of a defendant may grant a new trial to him if required in the interest of justice.... A motion for a new trial based on the ground of newly discovered evidence may be made only before or within 2 years after final judgment, but if an appeal is pending, only on remand of the case may the Court grant the motion....

**37.** D.C.Code § 23–110(a) (1981) provides:

A prisoner in custody under sentence of the Superior Court claiming the right to be released upon the ground that (1) the sentence was imposed in violation of the Constitution of the United States or the laws of the District of Columbia, (2) the court was without jurisdiction to impose the sentence, (3) the sentence was in excess of the maximum authorized by law, (4) the sentence is otherwise subject to collateral attack, may move the court to vacate, set aside, or correct the sentence.

son in exchange for his trial testimony, and had thereby violated his Fifth Amendment due process rights and his Sixth Amendment right of confrontation. The trial court denied the motion without a hearing on the basis of the files and records. D.C. Code § 23–110(c). Derrington contends the trial court erred in denying him a new trial and used the wrong standard in declining to vacate the judgment, thus requiring a remand for a full hearing on the motion to vacate. We affirm the denial of his motion.

Derrington claimed Melson recanted his trial testimony that Derrington was involved in planning the robbery and had only testified because the government had released him from jail prior to trial and promised to drop a pending rape charge against him.[38] The motion recited that the government dropped the rape charge after appellant's trial, declined to prosecute Melson on several other charges (except petty larceny) before trial, and filed several felony charges against him after the trial. In support of his claim of a deal, Derrington submitted Melson's affidavit in which he denied being able to overhear appellants' robbery-planning discussion, denied hearing Derrington tell Grayson to shoot anyone and denied seeing Derrington with a gun. Melson also stated he only testified because the prosecutor made sure he was out of jail before the trial and had "promised me that the rape case would be dropped but that first he had to talk to another prosecutor before it could be dismissed." Derrington also submitted the affidavits of Melson's mother and godfather, in which they referred to Melson not wanting to testify at appellants' trial and their efforts to persuade the prosecutor to release Melson from jail and to drop the rape charges.

 This court will not reverse the denial of a motion for a new trial in the absence of a clear showing of abuse of discretion by the trial court. *Strickland v. United States*, 389 A.2d 1325, 1327 (D.C. 1978), *cert. denied*, 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 481 (1979). Where the trial court has determined that asserted *Brady*[39] material would not have materially affected the verdict, the reviewing court is limited to a determination of whether that decision is reasonable and an independent review on direct appeal from denial of a motion for new trial is precluded. *Davies v. United States*, 476 A.2d 658 (D.C.1984). Where the basis for the new trial is a recanting affidavit, the first question is whether the trial court is "reasonably well satisfied that the prior testimony was false." *United States v. Kearney*, 220 U.S.App.D.C. 379, 385, 682 F.2d 214, 220 (1982) (if trial court determines to credit the recantation, then the court must determine whether it would probably produce an acquittal in a retrial or if, without it, the jury might have reached a different conclusion); *Godfrey v. United States*, 454 A.2d 293, 300 & n. 26 (D.C.1982). We hold the record supports the trial court's findings, and there was no abuse of discretion by the trial court in denying the motion for new trial.

The trial court found: Melson's recantation was not credible; his trial testimony was not false; his allegation of a "deal" for false testimony was meritless; and even if Melson's affidavit were believed, his revised testimony would not produce an acquittal at trial or cause a jury to entertain a reasonable doubt about Derrington's guilt since the allegations "at best" affected Melson's creditibility. For each of its conclusions, the trial court set forth its reasons and, upon review, we find the trial court's findings are reasonable and sup-

---

**38.** No criminal charges were pending against Melson when he first spoke to the police about the murder, although he was on probation for armed robbery and carrying a pistol without a license. By the time of appellants' trial, Melson was in jail charged with rape. The rape charge was dismissed by the government four and one-half months after appellants' trial.

**39.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

ported by the evidence in the record. *God-frey, supra,* 454 A.2d at 300; *Huggins v. United States,* 333 A.2d 385 (D.C.1975); *Heard v. United States,* 245 A.2d 125, 126 (D.C.1968); *Thompson v. United States,* 88 U.S.App.D.C. 235, 188 F.2d 652 (1951). *Compare Napue v. Illinois,* 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959).

Although it is not entirely clear the alleged "deal" evidence is newly discovered, it is understandable that defense counsel did not pursue questions about Melson's pretrial release from jail in view of the potential damage an answer might do to his client. *United States v. Leonard,* 161 U.S.App.D.C. 36, 44, 494 F.2d 955, 963 (1974) (cross-examination not curtailed by absence of explicit government promises of leniency).[40] In view of Holland's and Wright's testimony, Melson's testimony was clearly not essential to proof of Derrington's guilt, and the evidence of a "deal" would have been limited to use as impeachment evidence. The trial court noted its skepticism about Melson's recantation since it came after he had been telling the same story for two years and while he was in jail when a perjury prosecution was unlikely. The testimony was also limited and did not extend to Melson's testimony about why he testified (because a man had been killed), or why he was able to overhear the appellants' conversation (Melson was on the telephone, but "on hold" several times). The trial court's evaluation of Melson's credibility and the likely effect of his further impeachment is supported by the record since he had already been subjected to vigorous cross-examination.

■ The trial court's findings about the alleged "deal" are also supported by the record. It found there was no credible evidence Melson's testimony was false. Melson's affidavit did not suggest that his original report to the police was motivated

by a deal. The affidavits of his mother and godfather confirmed only their meetings with the prosecutor in an effort to get Melson released from jail and the rape charge dropped and fell short of alleging there was a specific promise in exchange for Melson's testimony. Nor did the assertions in Derrington's motion contradict the prosecutor's explanations to the trial court that Melson's pretrial release occurred when he made bond in the rape case and was thereafter released, with the government's consent, by another trial judge in two other cases.

The trial court also declined to vacate the judgment on the ground that "the files and records show conclusively" that Derrington was entitled to no relief. Derrington contends the record supports the claim in his motion and the trial court erred in concluding that there was a reasonable explanation for any such contradiction; he relies on *Pettaway v. United States,* 390 A.2d 981 (D.C.1978).

 The need for a hearing on a § 23–110 motion is diminished where a witness seeks to recant earlier testimony and the trial court has had the opportunity to observe the witness' demeanor and weigh the credibility of the witness at trial. *Kearney, supra,* 220 U.S.App.D.C. at 384, 682 F.2d at 219. On review of a motion to vacate sentence, the testimony must be considered most strongly in support of the jury's verdict. *Id.* at 387, 682 F.2d at 222. In our review of the alleged suppression of a "deal," we review the nature of the promise, if any, and the effect its disclosure could have on the credibility of the witness. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

Derrington's claim is premised on the assertion that Melson was a key witness whose further impeachment would have af-

---

**40.** After Derrington's counsel asked during a bench conference, whether Melson's release was "pursuant to his having given or giving testimony today, whether that is part and parcel of it," the prosecutor advised the trial court that Mel-

son was afraid of appellants. This is consistent with the record that Melson was to be separated from appellants and appellants were being held in tight security at the jail.

fected the jury's verdict. He relies on *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue, supra*, 360 U.S. at 271, 79 S.Ct. at 1178; *United States v. Iverson*, 205 U.S.App.D.C. 253, 637 F.2d 799 (1980); *modified*, 208 U.S. App.D.C. 364, 648 F.2d 737 (1981); and *United States v. Leonard, supra*, 161 U.S. App.D.C. 36, 494 F.2d 955. But unlike those cases, Derrington's conviction was not the result of a single key witness whose testimony was the difference between his acquittal or conviction by a jury; nor is there a confession of error by the government. Melson was not the only or necessarily the most damaging witness to Derrington. Moreover, Melson's credibility was explored at length during trial by both defense counsel, through cross-examination and closing argument, in their attempt to suggest to the jury that Melson's testimony was not worthy of belief.

Although there is authority which generally encourages a court to hold a hearing on a § 23–110 motion,[41] we conclude that the allegations in Derrington's motion to vacate were insufficient to require the trial court to hold a hearing. Unlike *Gibson v. United States*, 388 A.2d 1214 (D.C.1978), on which Derrington relies, the record before the trial court permitted it to evaluate the likely effect on the jury had Melson's affidavit been truthful and assuming the truthfulness of Melson's relatives' affidavits. *Compare Kearney, supra*, 220 U.S.App.D.C. 379, 682 F.2d 214 (full record) *with Gibson, supra*, 388 A.2d 1214 (virtually no record since defendant pled guilty but his allegations of ineffective assistance of counsel referred to matters outside record and, if true, entitled him to relief). The record supports the trial court's finding that Melson's trial testimony was credible and, viewing the evidence most favorably to the government, that further impeachment of his testimony would not have affected the verdict or raised a doubt which had not already been presented to the jury.

Accordingly, we affirm appellants' convictions except for their convictions of armed robbery of Mr. Metheny, and remand with instructions to vacate those convictions and resentence appellants accordingly; we affirm the denial of the motion for a new trial or to vacate judgment.

**41.** *Blackledge v. Allison*, 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977); *Fontaine v. United States*, 411 U.S. 213, 214–15, 93 S.Ct. 1461, 1462– 63, 36 L.Ed.2d 169 (1973); *Machibroda v. United States*, 368 U.S. 487, 494, 82 S.Ct. 510, 513, 7 L.Ed.2d 473 (1962).